FRANK I. RIDGELY *vs.* CHARLOTTE RIDGELY, alias CHARLOTTE HYATT, and EDWARD HYATT.

*Annulment of Marriage—Parties—Act of 1777, ch. 12, sec. 15, as re-enacted by Act of 1886, ch. 497, and codified as section 12 of Article 62 of the Code—Superior Court and Criminal Court of Baltimore City—Jurisdiction.*

By the Act of 1777, ch. 12, sec. 15, as amended by the Act of 1886, ch. 497 (Code, Art. 62, sec. 12), the authority to annul a marriage within the prohibited degrees of affinity, or a second marriage the first subsisting, is, so far as the Courts of Baltimore City are concerned, confined to the Superior and Criminal Courts.

Section 12 of Article 62 of the Code specifically limits the right to make the application to one of the parties to the marriage whose validity is assailed, and gives no third person the authority to invoke its provisions.

Nullity decrees, except for fraud or coercion, are pronounced solely under the Act of 1777 as now codified.

A married woman, without the consent of her husband, went to South Dakota and there procured a divorce *a vinculo matri-*

Ridgely *vs*. Ridgely.

*monii* from her husband, and shortly afterward married again. Her first husband filed a bill in equity against her and her second husband in Baltimore City, charging that the divorce procured in South Dakota was void, and praying that the so-called ceremony of marriage between the defendants might be declared null and void. No other relief was prayed. Upon demurrer to the bill it was HELD:

1st. That a Court of equity had no jurisdiction to pass the decree prayed for.

2nd. That the plaintiff was not the proper party to institute such a proceeding.

APPEAL from the Circuit Court No. 2 of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ROBINSON, C. J., BRYAN, FOWLER, PAGE, MCSHERRY and BRISCOE, J.

*Joseph P. Merryman*, for the appellant.

*Charles W. Field*, and *William A. Fisher*, for the appellees.

MCSHERRY, J., delivered the opinion of the Court.

In October, 1881, Frank I. Ridgely married the appellee, Charlotte, and they resided in Maryland continuously until October, 1892, when the said Charlotte left the State without the consent of her husband and went to South Dakota, where, in January following, she instituted pro-ceedings against her husband for divorce, which culmi-nated in a decree of divorce *a vinculo* on April 13th, 1893. A few days thereafter she returned to Baltimore, and in May following she married the appellee, Hyatt. It is al-leged in the bill of complaint filed by Frank I. Ridgely against his former wife Charlotte and her present hus-

band Hyatt, that she went to South Dakota for the purpose of procuring a divorce; that he was ignorant of her whereabouts during her absence; that she was without means of her own to defray her expenses, and that her conduct in this matter resulted from the influence of Hyatt, who fraudulently and illegally aided her in attempting to destroy the plaintiff's marital rights. The bill charges that the divorce procured in South Dakota is void, and prays that the " so-called ceremony of marriage between Edward Hyatt and the said Charlotte Ridgely may be declared null and void." To this bill a demurrer was filed, and upon a hearing thereof Circuit Court No. 2 (WICKES, J.) sustained the demurrer and dismissed the bill. From that decree this appeal was taken.

The jurisdiction of a Court of equity to pass a decree of the character prayed for, upon the application of a person not a party to the marriage alleged to be null and void, is directly presented. Treating, for the purposes of this discussion, the concessions of the demurrer as admitting the invalidity of the South Dakota divorce, how can a Maryland Court of equity, at the instance of Mr. Ridgely, annul a subsequent marriage of his wife to another person, upon a bill filed exclusively for that purpose and asking no other relief? That is the distinct question which this record brings before us for decision.

If such a power be possessed by a Court of equity it must have been acquired either as a part of its original inherent jurisdiction or by statute. But upon tracing the history of the English Court of Chancery prior to the American Revolution, no such power will be found to have been asserted or exercised by that tribunal. In point of fact, as early as the reign of Edward the Confessor the clergy assumed to decide all matters relating to marriage; but somewhat later the Ecclesiastical Courts took jurisdiction, both in respect of annulments for canonical disabilities and dissolutions by limited divorces for super-

advenient causes; and, acting on the ground that marriage
was a sacrament, held it to be indissoluble.   But, inasmuch
as adultery was a flagrant breach of the marriage vow,
it was soon found necessary to devise some means to
punish the offending party, and to relieve the innocent one
from the ties of a contract so incontestably violated.   Ac-
cordingly the Ecclesiastical Courts, but not the Court of
Chancery, began to decree separations on the ground of
adultery—such separations giving to the parties all the
rights of celibacy, except that of contracting a new mar-
riage.   Gradually the grounds of such separations were
extended, and cruelty and some other causes were allowed
as just and proper reasons to support them.   Thus much
having been conceded, men began to look forward to these
separations with a view to the formation of other and
more desirable ties.   Apparently to meet this growing de-
sire, but at all events contemporaneously with it, the ec-
clesiastical law expanded beyond their original limits
the degrees of consanguinity and affinity within which it
was declared unlawful to contract marriage.   " And not
only was it held that relations of the blood to the sixth
or seventh degree were incapable of contracting matri-
mony, but that if either party to the marriage had been
pre-contracted to another, the marriage was voidable; and
eventually it was declared that if it happened to any
man to have carnal connection with a woman, the same
relations in regard to affinity were thereby created be-
tween them as if an actual marriage had taken place.
Upon these grounds of pre-contract, affinity and carnal
knowledge, the ecclesiastical law, still upholding the doc-
trine of the sacramental indissolubility of marriage, * *
* * and declaring such marriages to have been null and
void *ab initio*, separated the parties '*pro salute ani-
marum*,' lest they should endanger their souls by living
in a state of known sin."   2 *Broom & Hadley's Com., side
page* 394.   Thus matters stood until the Reformation,

when the view of the reformers, including. Cranmer, was that a more extended system of divorce should be allowed; and that a second marriage should be permitted after a divorce for adultery. A digest of ecclesiastical law compiled under 3 & 4 *Edward* VI., *ch.* 11, having failed to receive the *imprimatur* of the law, by reason of the death of the king, there was no judicial authority in the realm which had jurisdiction to make such a decree as would enable a man or woman to marry again, and recourse was then had to the supreme power of the State—the king, lords and commons in Parliament assembled—to legislate upon the particular circumstances of each case. 2 *Broom & Hadley's Com., side page* 395. These applications to Parliament became precedents, and after 1701 became more numerous. No steps, however, were taken to reduce the practice there to any form till 1798, when Lord Loughborough's Orders were adopted. These, with some modifications, continued to control the method of procedure until in 1857, the Court of Divorce and Matrimonial Causes was created by 20 & 21 *Vic., ch.* 95. It will thus be seen from this rapid and imperfect sketch that from the very earliest times the jurisdiction to annul a marriage in England, when void, or avoidable on account of pre-existing impediments, or to dissolve it for supervenient causes, was vested in other tribunals than the Court of Chancery (*Shelford, Mar. & Div., side page* 459); and consequently when Maryland separated from the mother country the Maryland Court of Chancery did not acquire from the English Chancery any power over such cases— though in this State the Courts of equity, independently of any statute, but in virtue of their general jurisdiction to vacate contracts procured by fraud, have exercised the power to annul a contract of marriage when the marriage was induced or procured by fraud or coercion. But of this later on. The sole jurisdiction in divorce and matrimonial causes being at the time of the Revolution vested

in the ecclesiastical Courts and in Parliament, and no ecclesiastical Court having been established in Maryland, the legislature in 1777 passed an *Act, ch.* 12 by the 15*th sec.* of which it was provided: "That the General Court may inquire into, hear and determine, either on indictment, or petition of either of the parties, the validity of any marriage, and may declare any marriage contrary to the table in this Act, or any second marriage, the first subsisting, null and void. * * * *" The legislature in thus providing for judgments of nullity in certain instances, including both canonical and civil disabilities, did not confer jurisdiction upon the Court of chancery in the premises, but upon the General Court; and when the latter Court was abolished, this power was transferred, said Chancellor BLAND in *Fornshill vs. Murray,* 1 *Bl.,* 483, to the county Courts. Under the *Constitution of* 1851, *Art.* 4, *sec.* 11, the Superior Court of Baltimore City was given equity jurisdiction in that city. When, therefore, the Code of 1860 was adopted and the *Act of* 1777. *ch.* 12, *sec.* 15, was codified therein, it gave to the Courts exercising equity jurisdiction at that time—viz., the Superior Court of Baltimore City and the Circuit Courts for the counties—the authority to decree the nullity of marriages for the causes set forth in the old Act of 1777. The Constitution of 1867 deprived the Superior Court of all equity jurisdiction and conferred that jurisdiction exclusively upon the Circuit Court of Baltimore City. The organic and the statute law stood thus in February, 1881, when the case of *Le Brun vs. Le Brun,* 55 *Md.,* 496, was decided by this Court. In that case it was said: "Suits for nullity of marriage have been very rare in this State, but the power of a Court of equity to declare a marriage null and void, when a proper case is made out, cannot be questioned. The authority of the Court, however, to act in such cases, is not derived from the powers conferred by the divorce laws. * * * * If the marriage be procured by abduction,

terror, fraud or duress, the Court, in declaring it a nullity, acts in virtue of its general jurisdiction in matters of fraud affecting contracts, and by the marriage Act (*Code, Art. 60, sec.* 8) [*the Act of* 1777, *ch.* 12, *sec.* 15] express authority is given to the Courts to inquire into, hear and · determine the validity of any marriage, and may declare any marriage within the prohibited degrees of kindred or affinity, 'or any second marriage, the first subsisting,' null and void. These are the two sources of jurisdiction." This Court was strictly right when, in the case just cited, it referred to the Act of 1777 as codified in *sec.* 8 *of Art.* 60 of the Code of 1860, as one of the two sources of an equity Court's authority to nullify a marriage as contra-distinguished from granting a divorce. But in 1886, *by ch.* 497, the legislature repealed *sec.* 8 *of Art.* 60 *of the Code of* 1860 and then re-enacted it, and as re-enacted, it, in express terms, conferred upon the *Superior Court,* which then was, and still is, under the Constitution of 1867, a Court of *law,* and not a Court of equity, the authority to annul a marriage contract within the prohibited degrees, and a second marriage contracted whilst a first one is still subsisting. This Act of 1886 was re-enacted in 1888, when the Code of that year was adopted. The legislature had the undoubted right to confer this power upon either a Court of law or a Court of equity, or on both, as it had in fact done by including the *Criminal Court.* By virtue of this recent legislation, the authority to annul a marriage for any of the causes set forth in the Act of 1777 is, so far as the Courts of Baltimore city are concerned, confined to the *Superior and Criminal Courts.* This must be so unless we hold that when the legislature said, in 1886, *Superior Court,* they did not mean *that* Court but a Court of equity. It would scarcely be permissible to do this when we are dealing with a statute conferring a special jurisdiction, not inherently belonging to either a Court of law or a Court of equity, but

created solely by the statute now being considered. Nor could we treat the *Act of* 1886 as giving the Superior Court concurrent jurisdiction with the Circuit Court in this particular, without conceding to the latter the possession of this special power outside of and apart from any statute at all.

But, besides the difficulty which the Act of 1886 presents as to the right of a Court of equity in Baltimore City to pass a decree of nullity for any of the causes set forth in the Act of 1777, which, as amended by the Act of 1886, is now *sec.* 12 *of Art.* 62 *of the Code of* 1888, the language of that section specifically limits the right to make the application to one of the *parties* to the marriage whose validity is assailed, and gives to no third person the authority to invoke its provisions. In construing the Act of 1777 this Court, in *Harrison et al. vs. State, use of Harrison,* 22 *Md.,* 486, said: "No ecclesiastical Court existed here; and instead of destroying, it [the Act of 1777] erected a jurisdiction with power upon *petition of either of the parties,* or on indictment, to inquire into, hear and determine the validity of any marriage, &c." With the exception of cases falling within the Act of 1777, as now codified, and marriages procured by fraud, no marriage was or could be declared null in Maryland, save by the General Assembly, until 1841, when, for certain specified causes, now set forth in *Art.* 16, *secs.* 35, 36, 37 of the Code, the Courts of equity were empowered to decree *divorces* upon the application of one of the parties to the marriage. Speaking with strict technical precision, a decree of nullity is widely different from a decree of divorce, for the one is founded on the theory that there never was a marriage at all, whilst the other concedes that a valid marriage did exist but dissolves it; though a decree for a divorce may, under our Code, be passed for causes which would sustain a decree of nullity. *See notes to Lewis vs. Lewis,* 9 *L. R. A.* 505.

But the case before us does not fall either within the Act of 1777 or the above cited sections of the Code. It is not within the *Act of* 1777, as amended by the *Act of* 1886 and codified in *Art.* 62, *sec.* 12, because, first, that Act, as now codified, confers power upon the *Superior Court*, a Court of *law*, and not upon a Court of equity *in Baltimore City*, to act in cases covered by it and instituted under it; and, secondly, because the Act can only be invoked by one of the parties to the alleged null marriage, and not by some one else. The proceeding before us is not by Mr. or Mrs. Hyatt to annul their marriage, but by Mr. Ridgely to annul it for them and against their wishes. Nor is the pending case within either of the above cited sections of the Code, because the bill sets forth no one of the causes for which the injured party to a contract of marriage may seek to have it set aside; and furthermore it is not filed by such a party, but by a person not a party to the alleged invalid marriage at all.

Just here we may observe that there is some conflict in the authorities as to the right of a third party to inaugurate proceedings in the ecclesiastical Courts to procure a sentence of nullity. In the flexible forms of the ecclesiastical Courts whenever during the lives of both of the parties any inquiry into the validity of a marriage arose, it took at once the character of a suit for nullity, since this suit need neither be instituted nor carried on by one of the parties to the marriage, it being equally maintainable by any other person having an interest therein. 1 *Bish., Marr. & Div., sec.* 265; *Sherwood vs. Ray*, 1 *Moore, Privy Council,* 353. There are some instances given in *Shelford, Marr. & Div.* (8 *Law Lib.*) *star page* 179. But the complaining party must have some interest in the marriage, and generally the interest must be of a pecuniary character. Except in criminal cases this right of third parties seems to be very doubt-

ful. *Stewart, Marr. & Div. sec.* 328; *Cropsey vs. Mc-Kinney,* 30 *Barb.,* 47. Whatever may have been the practice in the ecclesiastical Courts, we have not succeeded to it, nor imported it into our Courts of equity, and nullity decrees, except for fraud or coercion, are pronounced solely under the Act of 1777 as now codified, which in terms, as we have said, is confined to an application by one of the parties.

But it is insisted that the general jurisdiction of a Court of equity is broad enough to embrace this case. Whilst Chancellor BLAND in 1828 did not regard the Act of 1777 as clothing the Court of chancery with authority to determine the validity of a contract of marriage, yet he held, in *Fornshill vs. Murray, supra,* that "by virtue of its general jurisdiction in matters of fraud affecting contracts, it would seem that, considering marriage as a mere civil contract, it [a Court of chancery] may, *at the instance of either party,* declare a marriage to be null and void, which has been procured by abduction, terror and fraud." He cited *Portsmoth vs. Portsmoth,* 1 *Hag. Rep.,* 355; *In the matter of Fust,* 1 *Cox,* 418; *Ex-parte Turing,* 1 *Ves. & Bea.,* 140; *Ferlat vs. Gojon,* 1 *Hopk.,* 478. And we may add *Le Brun vs. Le Brun,* 55 *Md., supra; Clark vs. Field,* 13 *Ver.,* 460; *Keyes vs. Keyes,* 22 *N. H.,* 553; *Wightman vs. Wightman,* 4 *John Ch.,* 343. Undoubtedly in the eye of the law marriage is a civil contract differing from other contracts in the circumstance that it cannot be rescinded by the mere consent of the parties. Being then a contract, it seems to follow that where it has been procured by fraud or duress, it may be set aside by a Court whose inherent jurisdiction gives it authority to annul any ordinary contract procured in the same way; provided the application be promptly made and before a consummation of the marriage by voluntary cohabitation. *Clark vs. Field, supra; Robertson vs. Cole,* 12 *Texas,* 356. In general, either party may

complain, but obviously in this as in other instances, the party guilty of the fraud cannot allege and rely on his own misconduct to avoid a contract procured by that means. *Stewart, Marr. & Div.*, secs. 46, 150, 151; *Browne, Div. & Al.*, 360.

The case made by the pleadings does not come within these principles, for the bill of complaint does not allege the *marriage* between Mrs. Ridgely and Mr. Hyatt to be fraudulent at all, or to have been procured by ·fraud or coercion. It does allege, though, that the South Dakota *divorce* is fraudulent and void, and inferentially, but by no direct ·charge, that the subsequent marriage was illegal and null. But the marriage might well be illegal and null to the extent of subjecting one of the parties to indictment for bigamy, without having been procured by fraud; and as this relief, if granted at all, must depend upon some fraud or force practiced by one party to the impeached marriage upon the other party to the same marriage, there must be appropriate averments to that effect in the complaint, as well as proper parties to the proceeding. It is upon the bald allegation of the invalidity of the Dakota divorce that the annulment of the Maryland marriage is asked. There is no charge that any rights of property are involved, and there is no injury complained of for which the law, either through the Criminal Courts or through the civil tribunals, by actions for damages, does not give the appellant ample remedy and redress.

The bill before us asks us to declare the marriage of Mrs. Ridgely and Mr. Hyatt void, not because it was procured by fraud, but because a valid prior marriage between her and the plaintiff is still in force. But the application is not made by either of the parties to the second marriage, and under the Act of 1777 as now codified, which is the only source from which any Court in Maryland derives the power to pass such a sentence or judg-

ment *for that cause,* no third person can institute such a proceeding. It follows, therefore; as the Court below had no jurisdiction to pass the decree prayed for, that its decree dismissing the bill must be affirmed.

> *Decree affirmed, with costs*
> *above and below.*

(Decided 19th June, 1894.)