# AURELIA C. BROWN

## vs.

## EARL WESLEY SCOTT.

*Annulment of Marriage—Fraud.*

Regarded as a ground for the annulment of marriage, there is no distinction between a fraud which induces consent, and a fraud which induces the appearance but not the reality of consent.                                                 pp. 265-267

In Maryland a marriage procured through fraud may be avoided.                                                 p. 267

Where fraud is recognized as a ground for the annulment of a marriage contract, it must be of such a character as to go to its very essence, and affect the free consent thereto of the injured party, and therefore, in any inquiry as to the existence of such fraud, the capacity of the party upon whom it was practiced is a material fact.                                                 p. 268

Where the misrepresentations or fraud relate to accidental matters, such as rank, fame, fortune, habits, temperament or the like, they do not go to the essence of the contract, and are not sufficient to justify the annulment of the marriage, but where the fraud relates to essential matters necessarily affecting the health or well-being of the parties themselves or any offspring of the marriage, it is sufficient for this purpose.                                                 p. 268

Where a fraud, practiced upon a person of immature years or weak mind, of such a character as to necessarily affect the health or well-being of the person injured, and where the true facts are such that no person of ordinary prudence would have made the contract with knowledge of them, induces such person to enter into a marriage contract, that contract may be avoided upon the application of the injured person, provided the application is made promptly upon the discovery of the fraud, where the status of the parties has not been affected by the intervention of the rights of children, born or unborn.                                                 p. 270

Where a professional swindler, whose life had been largely spent in prisons and reformatories, and who was thereafter

arrested and sentenced for crimes previously committed, induced a girl eighteen years old to marry him by false statements that he had left college to serve in the World War, that he was four years in service at the front and had been severely wounded, and that he was an honorable member of society, occupying a responsible position, *held* that, the girl having, as soon as she discovered the fraud, severed their relations and repudiated the marriage, she was entitled to have the marriage annulled.                                                        p. 271

*Decided January 13th, 1922.*

Appeal from the Circuit Court for Cecil County, in equity (WICKES, J.).

Bill by Aurelia C. Brown against Earl Wesley Scott, *alias* Joseph Earl Wesley Scott, *alias* Paul Worthington, *alias* Caleb Bragg. From a decree for defendant, plaintiff appeals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, and OFFUTT, JJ.

*Stevenson A. Williams,* with whom was *Fred. R. Williams* on the brief, for the appellant.

OFFUTT, J., delivered the opinion of the Court.

The only question presented by the appeal in this case is whether the fact that the marriage between the parties would not have been contracted by the appellant but for her belief, induced by false statements and fraudulent concealment on the part of the appellee, that he was a respectable citizen, whereas actually he was a convicted felon and had even then committed crimes for which he was afterwards sentenced to the federal penitentiary, was sufficient ground for the annulment of the marriage contract between them, when it also appeared that the appellant, as soon as she learned of the fraud, severed her relations with the appellee and repudiated the marriage.

The facts out of which that question arises are these:

In November, 1918, Aurelia C. Brown, then eighteen years of age, lived with her parents at Germantown, a suburb of Philadelphia, where she attended the Walnut Lane School as a day student. On the 29th of that month she was introduced by the usual "girl friend" at the Adolphia Hotel to the appellee, who then went under the name and title of "Lieutenant Earl Wesley Scott." His personal appearance, manners and conversation, as well as the air of romance that he becomingly wore as a wounded hero of the Great War, made a profound and pleasing impression not only upon Miss Brown but upon the members of her family, as indicated by the following extracts from their testimony: Mrs. Matilda Heath Brown, the grandmother of Miss Brown, said: "He was tall and handsome, light hair, blue eyes, pretty teeth, and very attractive manners; * * * He certainly had the power of attracting most any woman particularly as she became impressed with the various events of his career and the eloquent way he described them." Mrs. Fanny C. Brown, her mother, said: "He was a very attractive looking boy; looked like a college athlete; blue eyes, wavy hair, beautiful teeth and remarkable conversational powers," while the appellant herself added this to the symposium: "He was about five feet nine inches and weighed about 160 pounds, with very blond hair, blue eyes; he was very well dressed in a brown suit and overcoat, black shoes, he wore a wrist watch and was very good looking."

After their introduction on the occasion referred to, Scott and Miss Brown frequently met and in the course of these meetings he gave her this very spirited account of his life and experiences: "Enlisted in 1914 in the Royal Flying Corps among the first ones and had been four years in the service of the front; he said that he was a Harvard student and quarterback on the football team, he influenced seven of his chums to enlist; he told how all his chums were killed and he was the only one left, how one of his chums had been wrecked in a plane and had gone down behind the German line; he

told how he felt responsible for these lads.  He said some-times, when he was alone, he would see their dying faces and hear their dying words, sometimes in the night he would wake up and think he was over there and see the dying eyes of the Germans.  He spoke of how he suffered in the mud, the rain and the cold; he told how in the hospital, at the front it was just like a bloody death, with all the guns and the noises and sounds in the hospital.  He told how he was sent from the hospital in the front to England and then to Canada and he was discharged from there and had a pension given to him by the English Government.  He said he was in the hospital the day it was first reported the armistice was signed and he left the hospital that night and came to the United States, and in Buffalo he tried to enlist in the American Army and due to his injuries he was put in the secret service of the United States, instead of in the army, at a salary of $5,000 a year.  He also said that at the time I met him he was working for the Sun Shipping Company at Chester under orders from his chief and he received a salary there which he was allowed to keep.  He was supposed to get information in regards to slackers and profiteering; he got his information there and stayed at the Walton Hotel awaiting orders from his chief.  He was afraid his money would not hold out because several back checks had not been received from the Government.  He also said that he was in Harvard at the time the war broke out and gave me various accounts of his different experiences and his interest in football.  He spoke with a Bostonian accent and said he was born in Malden, Massachusetts, and had lived for a while in Boston, that his family had spent summers in Atlantic City at the Haddon Hall Hotel."

Miss Brown was so much affected by the combined force of his personal charms and this stirring tale of varied adventure that, instead of going to school on November 19th, 1918, as her family thought she did, she eloped with the appellee.  They first went to Media to be married, but could find no one to marry them there because the appellee was

"too young," and from there they went to Elkton, where they were married by the "Rev. McElmoyle." After the marriage she returned home and to school "as usual." This state of affairs continued until December 24th of the same year, when her father confronted her with proofs of the marriage, and on December 27th Scott was arrested at the Hotel Walton on a charge of impersonating a government officer. On the 26th of December, at her father's request, the appellant spoke to Scott over the telephone, and besought him to tell her more about himself and his family. He replied that all the things he had told them were "bunk and war whoop," which indeed proved to be the case. Upon an investigation it was discovered that Scott was an ex-convict, who had under various names led a life of crime since his boyhood. He had been convicted in the Criminal Court of Cook County, Illinois, of larceny in 1914, and had been sentenced to the Illinois State Reformatory for the "maximum term fixed by the statute"; he had been convicted of a similar crime in Philadelphia in 1913, and had been sentenced to a term of from a year to fifteen months in the Eastern Penitentiary of Pennsylvania, and there is evidence in the record of doubtful value that he had been convicted of other crimes prior to 1918, but because of the character of the evidence we will not refer particularly to them. His photograph was filed in what was described as the "Rogues' Gallery" of the Eastern Penitentiary of Pennsylvania, and he was known to the police of Philadelphia, Chicago, and other places, as a criminal.

Scott was arrested at the Hotel Walton on the charge of impersonating a federal official, and was subsequently tried and convicted of that offence and sentenced to six months in the Mercer County Jail. Upon his release he was tried and convicted in the District Court of the United States for the Middle District of Pennsylvania on the charge of falsely pretending, on November 15th, 1918, to be an officer and employee of the Secret Service Division of the Treasury Department of the Federal Government, with intent to de-

fraud Emma E. Flemming, and on the 9th of December, 1919, was sentenced to serve two years and one month in the United States penitentiary at Atlanta, Georgia.

When he first met Miss Brown, Scott pretended to be suffering severely from wounds received in France, and, to quote the record: "He was introduced as a member of the Royal Flying Corps, who had been wounded in France several months before, and who just came from a hospital in Canada; he showed signs of wounds by a scar on his forehead and on his mouth, and his whole left side was affected; he walked with a slight limp and couldn't use his left hand to any extent. It would take him about five minutes to get up from a chair, and he would gasp with agony. On the street he would have to stop with apparent pain." These appearances, however, were entirely misleading and false, and only adopted by Scott as a part of the pose which he had assumed, and were designed to give an appearance of verity to the story which he told.

The appellant stated in her testimony that she was induced to marry the defendant by his fraudulent representations and that had she known who he was she would not have married him.

Relying upon these facts, the appellant filed her bill of complaint in the Circuit Court for Cecil County, asking for the annulment of the marriage. The defendant, who was then in the federal penitentiary at Atlanta, Georgia, although given actual and constructive notice of the suit, interposed no defence, and a decree *pro confesso* was taken against him. Testimony supporting the bill was filed, and the case submitted for final decree. The lower court, in a very careful opinion, reached the conclusion that the facts referred to by us were not sufficient to warrant an annulment of the marriage, and accordingly dismissed the bill, the reason assigned for that conclusion being that no fraud, however gross its character, which merely induces consent to a marriage is material in a proceeding for annulment, and in sup-

port of that position the case of *Moss* v. *Moss* (1897), Prob.
Div. 268, was cited.

Briefly restated, the material and essential facts involved
in a review of this decree are these: An unscrupulous and
plausible swindler, prepossessing in appearance and with the
easy manners and the flowing speech of his kind, secured an
introduction to a school girl, whose discretion in nowise
exceeded her years. At that time not only was he an ex-
convict with a long criminal record, but had even then com-
mitted other crimes for which he was afterwards impris-
oned. This was his real character, but this character he
concealed from the appellant, and to render the deception
more secure he told her the false and wholly fabricated story
of his life, which he afterwards characterized as "bunk,"
and at the same time artfully simulated the appearance and
actions of a wounded soldier. By such means he secured
her confidence, and induced her to go through a clandestine
marriage ceremony with him, which she would not have
done had she known the truth.

We cannot agree with the lower court that these facts are
not sufficient to warrant the annulment of the marriage.

The record unquestionably shows that the marriage was
induced by deliberate fraud.

One line of cases, of which *Moss* v. *Moss, supra,* is illus-
trative, holds that such a fraud, one which merely induces
consent to the marriage, is not ground for avoiding a mar-
riage contract, and that rule is very clearly stated by Sir
F. H. Jeune, President, in these words: "But when in
English law fraud is spoken of as a ground for avoiding a
marriage, this does not include such fraud as induces a con-
sent, but is limited to such fraud as procures the appear-
ance without the reality of consent * * * In all these, and I
believe in every case where fraud has been held to be the
ground for declaring a marriage null, it has been such fraud
as has procured the form without the substance of agree-
ment, and in which the marriage has been annulled, not be-
cause of the presence of fraud, but because of the absence of

consent. * * * But when there is consent no fraud induc-
ing that consent is material."

The over nice and tenuous refinements resorted to in this
case to support the conclusion that, while fraud is ground
for avoiding a marriage where the consent to it is appar-
ent, but not real, it is not a ground where the consent is real,
but induced by fraud, are in our opinion unnecessary and
contrary to legal principles long established and very gener-
ally recognized. In the casès referred to by the court, in
reaching that conclusion, fraud was not even a necessary
element, but only an incident of the principal and essential
fact upon which those cases turned, which was the want of
consent. As, for instance, where one party to the marriage
pretended to be another, or where one party was weak minded
and did not understand the contract, or where the par-
ties went through a real marriage ceremony, believing it to
be only a mock ceremony. In such cases the real ground for
relief is the want of consent, and if that be shown, it is
immaterial whether it be accompanied by fraud or not, be-
cause there can be no contract unless the parties to it con-
sent to its terms, and where it appears for any reason that
the parties did not consent, there is no contract. The fault
of the reasoning and the rule adopted in *Moss* v. *Moss* is
that in effect it ignores the influence fraud may have in pre-
venting the real consent or agreement of the parties to the
contract. Fraud may be as effectual in preventing actual
consent as mistake or a want of capacity, and, where such
is the fact, in dealing with ordinary contracts its effect is
to vitiate and invalidate them, and there seems to be no good
reason why it should not have the same effect upon a mar-
riage contract. This view is very forcibly expressed in
*Scott* v. *Seabright,* 12 Prob. Div. (1887) 23, where it is
said: "The courts of law have always refused to recognize
as binding contracts to which the consent of either party
has been obtained by fraud or duress, and the validity of a
contract of marriage must be tested and determined in pre-
cisely the same manner as that of any other contract. True

it is that in contracts of marriage there is an interest involved above and beyond that of the immediate parties. Public policy requires that marriage should not be lightly set aside, and there is in some cases the strongest temptation to the parties more immediately interested to act in collusion in obtaining a dissolution of the marriage tie. These reasons necessitate great care and circumspection on the part of the tribunal, but they in nowise alter the principle or the grounds on which this, like any other contract, may be avoided."

In *Moss* v. *Moss, supra*, decided in the same court ten years later, this criticism of the decision in *Scott* v. *Seabright* appears: "Standing by themselves, these words may appear capable of a wider effect than any other English authority of which I am aware would warrant. But read in connection with the facts before the court, which showed a case of deception and force acting on a weakened mind, they do not appear to me to go further than to lay down that in the case of marriage, as in that of other contracts, fraud and duress may be so employed as to render an apparent consent in truth no consent at all." But while it may be possible to project as a pure abstraction a distinction between a fraud which induces consent, and a fraud which induces the appearance but not the reality of consent, the application of such a principle to actual concrete cases would result in much confusion, uncertainty and injustice.

A case of an apparent but not a real consent, which is frequently used to illustrate the distinction, is where a person is induced to think that a marriage is with one person where in fact it is with an entirely different person, really does not support the distinction at all. In that case there is, of course, no real consent. That is, there is a physical consent in which the mind does not concur, because it is not cognizant of the real nature of the contract, but believes it to be a different thing from what it actually is. But that may also be equally true of a fraud which induces consent to a contract. That is, if by fraud a person is induced to

assent to a proposition or an offer which is quite different from what it appears as the result of the fraud to be, there is no real consent.

As where a person, as in *Moss* v. *Moss,* was fraudulently led to believe he was contracting marriage with a chaste woman, when at the time of marriage she was pregnant by another man, there was the same want of real consent as in *Scott* v. *Seabright,* where the contract of marriage was made because the woman as a result of fraud believed that, unless she married, she would be subjected to bankruptcy proceedings and exposure. In the one case the error related to the parties, in the other to the consideration which induced the marriage. In neither case did the parties actually consent to what as a result of fraud they appeared to agree to. And yet the same court avoided the contract in *Scott* v. *Seabright* and sustained it in *Moss* v. *Moss.*

But whatever may be the law of England in respect to the effect of fraud on a marriage contract, the rule in force in this State is that a marriage procured through fraud may be avoided. In *LeBrun* v. *LeBrun,* 55 Md. 496, in speaking of the jurisdiction of a court of equity to annul a marriage on that ground, it is said: "If the marriage be procured by abduction, terror, fraud, or duress, the court, in declaring it a nullity, acts in virtue of its general jurisdiction in matters of fraud affecting contracts."

And in *Ridgely* v. *Ridgely,* 79 Md. 307, it is said: "Undoubtedly in the eye of the law marriage is a civil contract differing from other contracts in the circumstance that it cannot be rescinded by the mere consent of the parties. Being then a contract, it seems to follow that where it has been procured by fraud or duress, it may be set aside by a court whose inherent jurisdiction gives it authority to annul any ordinary contract procured in the same way; provided the application be promptly made and before a consummation of the marriage by voluntary cohabitation."

In the case last cited it will be noted that, in speaking of the jurisdiction of courts of equity to annul marriage con-

tracts, it was said that it attached in cases where application was promptly made, before a consummation of the marriage by voluntary cohabitation, but that language was not intended to exclude cases where the actual status of the parties had not been changed by the intervening rights of children born or unborn, and where the application for relief is made promptly upon the discovery of the fraud. If, then, courts of equity in this State have the power to avoid a marriage procured by fraud, the question arises as to what is the nature and kind of fraud that will warrant the exercise of that power.

In dealing with that question, the age and mental condition of the person injured by the fraud are important and at times controlling factors, since it is a matter of common knowledge that persons of immature years, or those whose will is weakened by age or disease, are more easily duped by designing people than are mature persons in the enjoyment of normal health and vigor. 26 *Cyc.*, 906.

Where fraud is recognized as a ground for the annulment of a marriage contract, it must be of such a character as to go to its very essence, and affect the free consent thereto of the injured party, and, therefore, in any inquiry as to the existence of such fraud, the capacity of the party upon whom it was practiced is a material fact.

In determining what facts will constitute such a fraud, there appears to be no rule more definite than this, that is, that where the misrepresentations or fraud relate to accidental matters, such as rank, fame, fortune, habits, temperament or the like, they do not go to the essence of the contract and are not sufficient, but where the fraud relates to essential matters necessarily affecting the health or well being of the parties themselves or any offspring from the marriage it is sufficient. The application of these principles may be illustrated by referring to a few cases in which this question has arisen.

In *Cox* v. *Cox* (N. J.), 110 Atl. 924, where a girl seventeen years of age was fraudulently induced by the defend-

ant's mother, to whose care she was entrusted, to marry her son, upon application prior to the consummation of the marriage, it was annulled.

In *Christlieb* v. *Christlieb* (Ind.), 125 N. E. 486, a girl sixteen years of age was induced, by the defendant's representations that he had never been married and had no children and was of good character, to marry him. These representations were false, and because of that fraud, taken in connection with the youth of the complainant, the marriage was annulled.

In *Lyndon* v. *Lyndon,* 69 Ill. 43, the defendant, who was a coachman, fraudulently induced the fifteen year old daughter of his employer to marry him. In securing the marriage license he committed the crime of perjury, of which crime she had no knowledge. In an opinion annulling the marriage, the court quoted with approval the opinion in *Robertson* v. *Cole,* 12 Tex. 356, in which it is said: "The license under which the officer of the law was officiating was not issued in good faith or on truthful statements, but on misrepresentations and false oaths. * * * Can the law condemn this victim of deception to a perpetual association with the criminal, by whom she has been inveigled into what, as to her, should be regarded as a mere mockery of marriage? If so, the boast of the law, that all its partialities expire in its antipathy to fraud, will be but mere idle words, having no foundation in truth."

In *Gatto* v. *Gatto* (N. H.), 106 Atl. 493, the defendant induced the plaintiff to marry her by fraudulently representing to him that she was a chaste woman. After the consummation of the marriage she informed him that she had been guilty of incest. In sustaining a decree of annulment the court said: "As marriage is deemed to be a civil contract and not a sacrament, fraud in a material respect which prevents a substantial meeting of the minds of the parties in an intelligent agreement for marriage cannot be said to be immaterial, or beyond the province of the court to correct by a decree of annulment. The public policy of this state, evi-

denced by the statutes, the decisions, or the general con-
sensus of opinion, does not regard a fraudulent marriage
ceremony as sacred and irrevocable by judicial action; it does
not encourage the practice of fraud in such cases by invest-
ing a formal marriage, entered into in consequence of deceit,
with all the force and validity of an honest marriage. While
marriage is a contract attended with many important and
peculiar features in which the state is interested, and while
it is one of the fundamental elements of social welfare, its
transcendent importance would seem to demand that wily and
designing people should find it difficult to successfully per-
petrate fraud and deceit as inducements to the marriage re-
lation, rather than that such base attempts should be regarded
as of trivial importance and be wholly disregarded by the
courts. Unhappy and unfortunate marriages ought to be dis-
couraged. *Sch. Dom. Rel.,* 24. The successful perpetration
of fraud is not deemed to be a subject for judicial encour-
agement (*Lyman* v. *Lyman,* 90 Conn. 390, 411, 97 Atl, 512,
L. R. A. 1916 E, 643), nor is the court authorized to legis-
late in favor of such a policy."

In New York, in a line of cases of which *Di Lorenzo* v.
*Di Lorenzo,* 174 N. Y. 467, is representative, it is held that
a marriage contract is not excepted from the general rule
that any fraudulent misrepresentation of a material fact is
sufficient ground for avoiding a contract induced thereby.
While we are not to be understood as adopting in their en-
tirety the conclusions reached in the cases referred to, they
are cited as supporting the principle that where a fraud prac-
tised upon a person of immature years or weak mind of such
a character as to necessarily affect the health or well being
of the person injured, and where the true facts are such that
no person of ordinary prudence would have made the con-
tract with knowledge of them, induces such person to enter
into a marriage contract, that contract may be avoided upon
the application of the injured person provided the applica-
tion is made promptly upon the discovery of the fraud, where
the status of the parties has not been affected by the interven-
tion of the rights of children born or unborn.

Applying these principles to the case before us we have no difficulty in reaching the conclusion that the marriage between the parties to this appeal should be annulled.

There could be no more cruel or injurious deception or one more seriously and permanently affecting the marriage relation than that practiced upon the appellant in this case. She was led by the appellee to believe that he was an honorable and honored member of society who had served and suffered in the defence of the nation in foreign lands, with whom she might reasonably have expected to live a happy and useful life. In reality he was a professional swindler whose life had been largely spent in penitentiaries and reformatories, and who was shortly after the marriage arrested, convicted, and sentenced for crimes he had committed before he met the appellant. Not only would life with him under such circumstances be abhorrent to a person of ordinary instincts and refinement, but every purpose of the marriage relation would be defeated.

To approve and sanction a fraud so gross and destructive, and to condemn this school girl to live out her life bound by the ties of marriage in an alliance so degrading, would be revolting to the common sense of justice, and would profane the very marriage relation itself. She was, it is true, culpably imprudent and indiscreet, but she was only a child, and therefore peculiarly an object of the solicitude and protection of a court of chancery, and the appellee should not be permitted by it to retain the profits of his fraud, which succeeded only because of that very imprudence and want of discretion so often associated with youth, upon which he relied.

For the reasons given the decree appealed from must be reversed and the cause remanded in order that a decree annulling the marriage between the parties may be passed.

> *Decree reversed and cause remanded for the passage of a final decree in conformity with this opinion. Costs to be paid by the appellee.*