# Bradford v. Bradford

364

*Cohen & Cohen*, for plaintiff.
*Theodore Spaulding*, for defendant.

SLOANE, J., October 19, 1951.—In this case a master was appointed to take the testimony and report thereon. He scheduled a meeting at which defendant appeared with an attorney in order to contest the case. The master thereupon took testimony only on the preliminary and jurisdictional matters, upon which he has reported, and in accord with the rule of this court, referred the case back for a hearing on the merits.

I approve and adopt the master's preliminary report as to marriage, residence, age and occupation, children, military service. There is no collusion in the case. Jurisdiction of the parties and the subject matter is unquestioned.

The master having reported that the case was to be contested, the hearing upon the merits was listed before me. At this hearing, counsel for defendant, Theodore Spaulding, appeared and brought with him a telegram he had received from his client that morning. The telegram was somewhat unclear but defendant stated in it that he was leaving without forwarding address, and was evidently dropping his contest. Counsel for defendant also stated that certain fees, expenses and alimony that defendant had promised to pay had not been paid. The attorney requested and was allowed to withdraw from the case, and the hearing on the merits proceeded ex parte as in an uncontested divorce action.

The grounds for divorce alleged in the complaint are: (a) Indignities to the person, and (b) fraud.

The evidence in the case came from plaintiff and four witnesses for her. Since there was no opposition, there was no cross-examination of plaintiff or her witnesses, and no testimony for defendant. However, I saw and heard plaintiff and the witnesses and I find them to be credible. I accept their testimony as true.

The bulk of the story came from plaintiff herself. She first met defendant in March 1938. She did not see him again till September 1938 and then began to go with him once or twice a week, until March of 1939. At that time he told her he would join the merchant marine, and she neither saw nor heard from him for 8½ years after that. In November 1947, altogether unexpectedly, she got a telephone call from him and agreed to see him. They started again to go out together, about once or twice a week during all of 1948 and into 1949. Defendant told her he had been away in service, and had been sent to England and to Alaska as an engineer. He brought up the question of marriage but plaintiff felt she did not know enough about him and wanted to wait. She finally did agree, and on August 25, 1949, they were married. Plaintiff was 30 and defendant 33 years old at the time.

It did not take long for plaintiff to find that defendant was a far different person from what he had represented himself to be. About two weeks after the marriage relatives of his wanted some money from plaintiff and when she would not give it he cursed her in vile language. He called her "a stingy old bitch", "God damn you", and used other foul expressions toward her. He never contributed any money whatsoever to the household and plaintiff kept it up entirely by herself. She was steadily employed, at do-

mestic work. Defendant was unemployed for a time after the marriage.

He finally did get a job as handyman but still did not give any money for the house. He started to come in "at all hours", was usually drunk when he did get in, and was loud and quarrelsome. He would demand sexual intercourse at such times and if she did not agree he called her "God damn little whore". On one occasion he was fined $22.50 and costs for speeding and plaintiff even paid his fine to save his license on which his job depended. Defendant continued to stay out a great deal and was abusive to her when he was home.

In May 1950, plaintiff went to Stone Harbor, N. J., where her employer has a summer home. Defendant was supposed to come down to see her on the weekends but usually he did not come. Plaintiff got a call that he was sick and she came to Philadelphia to see him. He claimed to have been injured at his work but it turned out that this was not true and that his real illness was some trouble with his privates, a condition he got by going with other women.

Plaintiff testified that defendant had intercourse with her a number of times without regard to her menses and that he compelled her by physical force to have relations at such times. On another occasion, in October 1949, he struck her in the face with his fist because she told him he should not drive without a license. Her face was swollen for a week.

In early September 1950, at a time when defendant was with plaintiff at Stone Harbor, he left the house one night at 11 o'clock. He told her he was going to get a road map and buy some gasoline. She was awakened about 1 a.m. by the ringing of the telephone. It was her husband; he told her he had been arrested and asked her to bring his driver's license over. He

was being held in custody by the Cape May, N. J., police. She brought his license but it turned out that he was also being held for prowling around someone's property. Defendant was given a hearing the next day and sentenced to 90 days in jail and fined. Plaintiff paid his fine.

As a result of the arrest a criminal record of defendant was compiled by the Cape May police. It showed he had been arrested about a dozen times under various aliases, that he had been convicted on most of these arrests, and that he had served prison sentences for assault and battery, larceny, robbery while armed and on other charges. He had been in jail during most of the interval between 1939 and 1947 when she did not see him, and his stories of having been in the service in this country and abroad had been inventions. He had not been in the service at all.

Plaintiff never lived with defendant after he was given the jail sentence in Cape May. When he got out he came to see her several times to try to persuade her to take him back, but she refused. On one occasion he hid in the home where she worked and suddenly stepped up behind her when she came in. He threatened to choke her to death if she did not take him back. He also threatened her another time when he met her on the street.

The last sexual relations between the parties took place sometime in August 1950.

Plaintiff testified she conducted herself as a good wife, took care of the meals, laundry and personal needs of her husband. She gave him no cause for abusive treatment.

Harrison W. Kiah, a cousin of plaintiff, was one of her witnesses. He testified that he roomed in the same house where the parties lived and observed how they got along. He corroborated plaintiff that de-

fendant used vituperative language toward her continually, and that he came home late and drunk many times. He also related that during the summer of 1950 when plaintiff was away at the seashore he used to go out with defendant a great deal. They went out about three or four times a week with a group of men and women. Defendant consorted particularly with a woman named Josephine and stayed in her apartment many hours at a time. He admitted to the witness that he had sexual relations with this woman. The witness was believable though he did not put himself in a good light with his testimony; his own activities were presumably similar to those of defendant.

Another witness, Hazel Daniels, who visited plaintiff frequently, gave corroborating testimony. She said plaintiff was an excellent housekeeper. Defendant was, however, rarely at home in the evenings. She did hear him tell some of his stories of having been in the engineers' branch of the service and having been overseas on that duty.

Mrs. Jack Greenberg, for whom plaintiff works as housekeeper, testified for her. She spoke highly of plaintiff as an excellent employe. She corroborated her story about the arrest of defendant in Cape May in early September 1950. She was the one who received the copy of defendant's criminal record from the Cape May police. The witness also testified that defendant had threatened her over the telephone because he thought she was helping plaintiff with her divorce action.

Mrs. Greenberg's daughter was also present at the hearing. She did not testify fully; it was stated that her testimony would be similar to that of her mother.

Plaintiff's evidence clearly established the first ground relied on: Indignities to the person. Without justification, defendant continually applied vile lan-

guage toward plaintiff, beat her severely on at least one occasion, usually came home late and in a drunken condition, compelled her by force to submit to sexual intercourse while in her menses, failed and refused to make any financial contribution toward the household, was guilty of misconduct with another woman, altogether showing settled hate and estrangement. A course of continued treatment rendering the condition of plaintiff intolerable and life burdensome was proved beyond question. Plaintiff is entitled to a divorce on the ground of indignities. See Brown v. Brown, 163 Pa. Superior Ct. 490; Martin v. Martin, 154 Pa. Superior Ct. 313. While nonsupport in itself does not constitute an indignity (Fisher v. Fisher, 154 Pa. Superior Ct. 497, 504), such conduct may be considered as shedding light on the attitude of defendant toward his wife; see Megoulas v. Megoulas, 166 Pa. Superior Ct. 510, 513. Evidence of defendant's adultery is admissible on a charge of indignities (Phipps v. Phipps, 368 Pa. 291). I have no doubt of the sufficiency of plaintiff's proof of indignities.

Plaintiff avers a second ground for divorce: Fraud. She bases this on defendant's concealment of his criminal record from her before they were married and his representation that he had been in service and was a person of good character. She was completely deceived by him and did not discover the true facts until his arrest in Cape May more than a year after the marriage. She never ratified the marriage by living with him after she discovered the true situation.

The Divorce Law of May 2, 1929, P. L. 1237, sec. 10, amended by the Act of March 19, 1943, P. L. 21, sec. 1, 23 PS §10, provides that:

". . . it shall be lawful for the innocent and injured spouse to obtain a divorce . . . whenever it shall be judged . . . that the other spouse . . . (g)

Shall have procured the marriage by fraud, force, or coercion, and which has not been subsequently confirmed by the acts of the injured and innocent spouse . . . ".

Fraud is thus a ground for divorce but it must be such fraud as goes to the "essentialia of the marriage contract": Allen's Appeal, 99 Pa. 196, 200. See A. B. v. C. D., 50 D. & C. 454. Interpretations of what constitutes fraud vitiating a marriage contract vary widely in different jurisdictions. Our State has adopted the "strict rule" and misrepresentations of various kinds have been held not to be fraud. For a collection of cases, see Freedman, The Law of Marriage and Divorce in Pennsylvania, vol. 1, pages 386 et seq., particularly section 157.

In Talbot v. Talbot, 19 Dist. R. 1009, the respondent concealed the fact that he was an escaped felon. Soon after the marriage he disappeared, but was later apprehended and returned to prison to serve out his sentence. It was held that he was guilty of a fraud which constituted a cause for divorce.

That case however cited, and relied in part, on New York cases where the fraud rule is not so strict as in this State. Moreover, the court there found that a decree was warranted even on the separate and distinct ground that respondent had been convicted of a crime, though the conviction antedated the marriage. Under the circumstances of this case I do not think the Talbot decision should be followed. The evidence does not show that this defendant was an escaped felon or a wanted person at the time he courted and married plaintiff. She went with him almost two years before agreeing to marry him. Since misrepresentations as to name, rank, fortune, health or character of a prospective spouse are not regarded as touching the "essentialia" of the marriage relation, such misrepre-

sentations have been held not to constitute such fraud as would invalidate a marriage. Defendant's deception here did not go to the essentials of the marriage relationship and though plaintiff was deceived by him, I do not find that it amounted to the fraud that our statute and the decisions contemplate. Cf. the leading Maryland case of Brown v. Scott, 140 Md. 258, 117 Atl. 114.

I conclude that plaintiff has not established her right to a divorce on the ground of fraud.

### Decree Nisi

And now, October 19, 1951, the prayer of the complaint is granted, and this decree nisi is hereby entered divorcing plaintiff from the bonds of matrimony contracted with defendant, upon the ground of indignities to the person.

Proper notice of the entry of this decree shall be given; if no exceptions are filed within 10 days thereafter, a final rule for divorce a. v. m. may issue.