# ARTHUR D. HALL, III *v.* PATRICIA R. HALL

[No. 978, September Term, 1975.]

*Decided July 27, 1976.*

The cause was argued before MORTON, POWERS and GILBERT, JJ.

*Wallace Dann,* with whom were *Bregel & Bregel, Chartered,* on the brief, for appellant.

*Donald F. Rogers,* with whom were *Lichter, Coleman & Rogers* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant, Arthur D. Hall, III, has appealed from decrees issued by Judge J. Albert Roney, Jr., after hearings held in the Circuit Court for Cecil County, wherein the appellant's bill of complaint for an annulment of his marriage to the appellee, Patricia R. Hall, was dismissed; the appellee was granted a divorce a vinculo matrimonii; the ownership of properties claimed by the parties was determined; and the appellee was awarded permanent alimony in the amount of $115 per week.

The appellant raises ten separate issues in this appeal and since his attack upon the decrees is largely grounded upon the asserted insufficiency of the evidence to support the chancellor's action, we shall set forth in full Judge Roney's findings of fact and conclusions of law:

## "COURT'S OPINION

At 1:48 p.m., on June 28, 1974, Arthur D. Hall filed his Bill of Complaint for an annulment of his marriage to Patricia R. Hall, and at 3:36 p.m., on the same date, Patricia filed her Bill of Complaint against her husband Arthur for a divorce a vinculo. On April 3, 1975, Arthur filed an Amended Bill of Complaint. The cases were tried together with consent of counsel and the Court has treated them more in the nature of a Bill and Cross-Bill than as

separate cases. For the purpose of simplicity the parties will be referred to herein as Arthur and Patricia.

Arthur's Bill of Complaint for an annulment and Patricia's Bill for divorce are both based on the fact that at the time of their marriage on June 13, 1970, Arthur was still lawfully married to his first wife Helen and therefore his marriage to Patricia was bigamous. It was agreed and stipulated by the parties, however, that there was no fraud or deception on the part of either party in entering into their marriage, as both were unaware that the divorce ostensibly obtained by Arthur's first wife Helen on October 14, 1968, in the Circuit Court for St. Clair County, Pell City, Alabama, was invalid. In addition to asking for an annulment of his marriage Arthur prays the Court to declare all property, real and personal, titled in both their names, either as joint tenants or tenants by the entireties, as his sole property and to account for certain moneys to Arthur D. Hall, Inc. Patricia seeks, in addition to a divorce a vinculo, alimony, attorney's fees, and a determination of the ownership of the jointly held personal property.

It is imminently clear that this marriage must be dissolved because it was bigamous at its inception. The question is how it should be done — by annulment or divorce.

On September 7, 1947, Arthur married one Helen S. Hall, and they thereafter lived together as man and wife until August 1966 when they mutually agreed to live separate and apart. In December 1966 Arthur met Patricia who was living separate and apart from her husband. Each was well aware of the marital status of the other and of the proceedings by their respective spouses to obtain a divorce. On December 1, 1967, Patricia's husband, James W. Flosdorf, was granted an absolute divorce from her by the Court of Common Pleas for

Franklin County, Pennsylvania. On October 14, 1968, Arthur's wife Helen ostensibly obtained, an absolute divorce from him in the Circuit Court for St. Clair County, Alabama, a copy of which decree was received by Arthur from one John Ike Griffith, Attorney, Birmingham, Alabama. Relying in good faith upon the authenticity and validity of the Alabama divorce decree, Arthur and Patricia were married on June 13, 1970, in Bucks County, Pennsylvania. After living for awhile at Washington Crossings, Pennsylvania, they purchased a 220-acre farm near Port Deposit in Cecil County, Maryland, in December, 1971, for which they received a deed, made to them as tenants by the entireties, dated April 7, 1972. The farm then became not only their residence but the principal office of A. D. Hall, Inc., an engineer and consulting business formed by Arthur and Patricia as incorporators and sole stockholders in May 1971. In a telephone conversation with his first wife Helen in August 1973, to which Patricia was listening in, Arthur and Patricia learned for the first time from a remark that Helen made that there was a possibility that the Alabama divorce was invalid. Arthur instigated an immediate investigation into the matter and the invalidity of the Alabama divorce was confirmed by a certificate of the Register of the Circuit Court for St. Clair County, Alabama, in Equity, dated September 26, 1973, which was forwarded to Arthur by his attorney on October 2, 1973. Arthur immediately filed suit on October 10, 1973, against Helen S. Hall in the Circuit Court for Cecil County, Maryland, for a divorce a vinculo on the ground of separation of the parties since August 1966, and he was awarded an absolute divorce by decree of the Court dated December 21, 1973. Except for three occasions when Patricia left Arthur for a brief period of time (not more than a week or ten days at the longest), the

parties lived together as man and wife until May 4, 1974, when Patricia left the domicile and they have lived separate and apart ever since.

The fact that Arthur married Patricia while his marriage to his first wife was still in effect makes the marriage void ab initio. The Court therefore can either annul the marriage or dissolve it by granting a divorce. Article 16, Sec. 24. Clayton v. Clayton, 231 Md. 74.

It is conceded that the parties entered into the marriage in good faith. Thereafter they pursued a rather normal marital relationship for almost four years during which time they sincerely believed they were legally married. An annulment of the marriage fails to recognize any marital relationship between the parties, while a divorce, on the other hand, does recognize the marital relationship. It can hardly be denied that a normal marital relationship did exist between the parties to this cause, even after Arthur obtained a divorce from his first wife in December 1973. Under such circumstances this Court believes that the dissolution of the marriage by divorce is more appropriate than by declaring it annulled.

In his amended Bill of Complaint Arthur alleges, in addition to the marriage being bigamous, that Patricia perpetrated a fraud upon him in that she was guilty of adulterous conduct while married to her former husband which he did not discover until after he married her, and that had he known of her prior adulterous conduct he would not have married her. The Court is not so convinced. He was fully aware of the pending divorce action of Patricia and her former husband in which the husband was the complaining party. He accompanied her on visits to her attorney and they discussed the divorce action on several occasions. He certainly must have been aware of all the details of the divorce. Furthermore, it was admitted that

he and Patricia carried on an intimate relationship while both were still married. If she would carry on an adulterous relationship with him, it certainly should have come as no surprise and shock to him to learn that she may have had an adulterous relationship with others. The court is just not persuaded that he would not have married her had he known of her prior adulterous conduct. The burden is on him to prove his allegation of fraud to entitle him to an annulment of his marriage, and he has failed to do so.

The Court will therefore deny the prayer in Arthur Hall's Amended Bill of Complaint for an annulment of the marriage and grant the prayer of Patricia Hall for a divorce a vinculo.

The Court next considers Patricia's prayer for alimony. In the Clayton case, supra, it was established that alimony could be awarded incident to a divorce granted on the ground that the husband had another wife living at the time of the marriage. Arthur challenges her right to alimony on two grounds, namely, that she is the party at fault in deserting her husband, and secondly, that alimony may not be awarded in cases of divorce based on nonculpatory grounds.

The case of Flanagan v. Flanagan, 270 Md. 335, puts to rest the second argument. The Court stated (page 338) that:

'We have consistently construed this section (Sec. 3 of Art. 16) when applied in connection with divorces on nonculpatory grounds to permit an allowance of alimony to the wife regardless of who originally initiated the action. * * * Therefore, in any suit for divorce on nonculpatory grounds, dissolution of the marriage permits the court to consider the granting of alimony so long as the question is put in issue by either the original bill or a

cross-bill, or by requesting such affirmative relief in an answer.'

Arthur's argument that Patricia is the party at fault in bringing to an end their marital relationship because she deserted him without just cause or reason is not supported by the facts. The one thing above all others that disrupted this marriage and was directly responsible for it ending in divorce was the shocking revelation that they were and had been living together while not legally married to each other because of the invalidity of the divorce proceedings instituted by his first wife. The other reasons assigned by Patricia for leaving, namely, the alleged sexual advances of Arthur toward her daughter, and his abusive and violent conduct toward her were too remote in time to have been instrumental in causing her to leave when she did.

The discovery of the invalidity of Arthur's divorce from his first wife directly precipitated the separation. Upon learning of it their relationship was never the same thereafter. It is not surprising that when she learned in February 1974 that Arthur had not revealed to her that he had obtained a divorce from his first wife in December 1973 that she should be extremely upset and have reason to question his intentions of marrying her as he had agreed to do when the divorce proceedings were instituted. Under these circumstances it could hardly be expected that she would continue living with him.

It is conceded that the parties hereto entered into their marriage in good faith and that no fraud can be attributed to either party in entering into the marriage contract. At the time of their marriage both parties undoubtedly looked forward to and expected a long and happily married life together. Their relationship toward each other, working together in carrying on the business, purchasing

and maintaining a large and beautiful home, and sharing in the activities of both business and pleasure together indicates a normal marital relationship. There is nothing to indicate that they were not sincerely in love with each other when they married and to all intents and purposes expected their marriage to be a long and happy one. It offered security for Patricia, and not only companionship for Arthur but valuable assistance to him as well in the conduct of his business affairs. While it is difficult to predict what another woman might do under the circumstances, and while it might reasonably be argued that a faithful wife would not leave her bigamous husband if she were truly in love with him, it is difficult to blame Patricia for leaving her husband when she did and under the conditions then existing. Fault is only one of several factors to be considered in properly awarding alimony in a nonculpatory as well as a culpatory divorce. Flanagan v. Flanagan, supra. In this case it is difficult to assign any real or significant fault to either party for their eventual separation. However, the separation may not have occurred had Arthur acted promptly upon obtaining his divorce from his first wife in so informing Patricia and remarrying her as he had promised. This was the direct cause of her leaving and for this he was at fault. Finding it difficult to assign any particular blame or fault on the part of Patricia for the dissolution of the marriage the Court believes that she is entitled to receive alimony, if she is otherwise justified.

As it has often been stated by our courts, 'alimony is based upon need and is never a punitive measure.' The factors that the court should consider in arriving at a proper award of alimony were enumerated in Timanus v. Timanus, 178 Md. 640, as follows:

'It is a general rule that a court, before

determining the award of alimony, should consider the maintenance of the wife in accordance with the husband's duty to support her suitably, together with the husband's wealth and earning capacity. In addition to the financial circumstances of the parties, the court should also usually consider their station in life, their age and physical condition, ability to work, the length of time they lived together, the circumstances leading up to the separation, the fault which destroyed the home, and their respective responsibilities for the care and support of the children.'

The testimony given in this case would permit the court to consider all the facts aforementioned, except that there is no testimony before the court upon which the court can determine Patricia's present and future needs. She stated that she is now living with a friend and is using the balance of the money she received from the settlement with her first husband for her subsistence, but she did not testify, and the court has no way of knowing, what her present living expenses amount to, and whether or not they are reasonable. The court should not speculate upon such an important matter. The court will therefore reserve unto Patricia the right to alimony pending a hearing before this court to determine the amount, if any, to be awarded.

The court now turns to the question of the division of the jointly owned property of the parties.

Section 3-603 of Courts & Judicial Proceedings, Annotated Code of Maryland, provides:

'(a) In general. — A court of equity has jurisdiction in an action for divorce, alimony, or annulment of marriage. The court shall hear and determine a case of alimony in as full and

ample manner as such case could be heard and determined by the Ecclesiastical Courts of England.

'(b) Determination or division of personal property. — A court granting a limited or absolute divorce may determine the ownership of personal property, other than chattels real, held, possessed, or claimed by a party to the divorce proceedings, and in accordance with that determination may:

(1) Make a division of personal property between the parties.

(2) Order a sale of personal property and a division of proceeds; or

(3) Make any other disposition of personal property it deems proper.'

Both parties have prayed the court to determine the ownership of the real estate held by the parties as tenants by the entireties. Involved is the 221.74 acre farm located near Port Deposit and an unimproved building lot in Elkton. Under the aforementioned statute the court has no jurisdiction in a divorce proceeding to make that determination, in the absence of proof of fraud by one of the parties in bringing about the marriage. As already stated, there has been a finding by this Court that no fraud was involved here. Where 'people living together as husband and wife, and in good faith believing themselves to have that status, acquire property by their joint labor and enterprise, take title to the same as tenants by the entireties.' [1] Hutson v. Hutson, 168 Md. 182; Donnelly v. Donnelly, 198 Md. 341. It is well settled that the effect of the granting of a divorce upon real estate held by the parties as tenants by the entireties is to convert their respective interests

---

1. *But see* Donnelly v. Donnelly, 198 Md. 341 (1951).

therein to that of tenants in common. See Wright v. Wright, 2 Md. 429, and Keen vs. Keen, 191 Md. 31.

The personal property held by the parties jointly includes:

Household furnishings at the farm house at Port Deposit, Maryland

1000 shares — Arthur D. Hall, Inc.

100 shares — Singer Co.

100 shares — Syntex

100 shares — Union Oil of California

11 shares — General Instrument

200 shares — Standard Oil of California

Account No. 876-45007, Merrill Lynch, Pierce, Fenner & Smith, Inc. ($25,000)

Trustee Account, proceeds of redemption of $40,000 Treasury Bills

The division of the personal property depends upon the degree of ownership of the respective parties therein. A court of equity, when sitting as a divorce court, may not transfer the property of one spouse to the other or otherwise dispose of it. However, as stated in Abell vs. Abell, 12 Md. App. 99,

'having found that the personal property was owned equally by the parties, the Chancellor was powerless to do anything more under the terms of Section 29 than to make an equal division between the parties of the jointly owned property or, in the alternative, to order a sale of the property or such part thereof deemed necessary to effectuate an equal division, and to order the proceeds of sale to be equally divided between the parties.'

Arthur contends that their assets hereinbefore listed 'were purchased with money either owned by Arthur individually prior to his marriage to

Patricia, * * * or with money earned entirely by Arthur after their marriage, and set aside for specific purposes, i.e., income taxes, patent expense, payments due first wife, etc., and that he merely put them in joint names to quell Patricia's fears of his predeceasing her and everything being tied up in his estate,' and therefore all the assets are his sole property.

The facts do not bear this out. At the time of their marriage in June 1970 Arthur was employed by the SCM Corporation at a yearly salary of $48,000. Under an agreement with his first wife he was required to pay her $660 per month for support and provide a $40,000 educational trust for his children. He had at the time an equity of about $17,000 in a home in Pennsylvania, an airplane which he sold for $7,000, A T & T stock valued at $10,000, an automobile and some cash. Patricia was at the time receiving $200 per month child support from her first husband; she owned a 1968 Chevrolet, SCM stock valued at $1,800, and about $6,500 which she received as a settlement from her first husband. Some months later his employment with SCM was terminated. He and Patricia then formed the Arthur D. Hall corporation which involved the sale of the expertise of Arthur in the field of tele-communications. Arthur was President and Patricia was Secretary and 1000 shares of stock was issued to each as tenants by the entireties. Each contributed by their joint efforts to the success of the business. According to his 1971 tax return his income for the year was $8,077.87. Compensation paid to Patricia by the corporation that year was $1,700. Corporate tax returns indicate that they each devoted 100 percent of their time to the business of the corporation. The business grew and prospered through their joint efforts until the time of their separation in May 1974. During this time, as the records indicate, she

was paid by the corporation for her services. Arthur contends that these payments to her were part of a scheme to make his income appear to be less than it really was so that his first wife could not claim additional alimony. The corporate income tax returns made under oath show payments made to Patricia for her services to the corporation, and this Court accepts them as correct. Arthur can hardly deny what he has sworn to on the income tax returns. During this time they acquired the assets hereinbefore listed with the fruits of their joint endeavor and these were put in their joint names as owners. Patricia sold her SCM stock for $550 and the money received therefrom was pooled with money that Arthur contributed to purchase other stock in their joint names. Throughout their marriage these parties were engaged in activities of mutual interest and benefit to both. Having married in good faith and having a normal marital relationship, it is not unusual or surprising to find them pooling their resources and placing their assets, which they acquired through their joint efforts, in both their names to indicate equal interest and ownership therein. There is no evidence to substantiate Arthur's allegation that the assets were put in their joint names to quell her fears of his predeceasing her. On the contrary it strongly indicates that by so doing they recognized an equal ownership in the property. The Court therefore finds that the parties contributed equally to the purchase of the several stocks hereinbefore listed, as well as to the account with Merrill Lynch, Pierce, Fenner & Smith, Inc., in the amount of $25,000, and the Trustee Account which represents the redemption of $40,000 Treasury Bills, and therefore each are entitled to a one-half interest therein.

Their household furnishings consist of articles, some of which were supplied by each one originally

and some acquired through their joint efforts. There is a complete lack of testimony upon which the court can determine specifically which if any item was acquired solely by one or the other. The court therefore concludes that the household furnishings are jointly owned and unless the parties can agree on a division of the household furnishings between them, the Court will order that they be sold and the net proceeds divided equally between them.

Patricia makes a further claim for an accounting by Arthur of her share in three separate transactions involving money she claims is hers, namely, the proceeds from the payoff of the Schmel mortgage, money in a joint account in the Washington-Lee Savings & Loan Association, and the money in the joint account at Yardley Savings & Loan Association.

In March 1973, the corporation paid to both Patricia and Arthur by check $10,000 as salary, according to Arthur's testimony, which they pooled and loaned to one Michael Schmel and his wife, secured by a mortgage to both of them as mortgagees on the Schmel property. The mortgage debt was paid off on April 10, 1974, and Arthur deposited the $20,000 in a savings account in the Elkton Banking and Trust Company, being No. 7-04387-9, which he opened in his name alone, on May 10, 1974, just six days after the separation of the parties. As the court has already indicated, the money paid to Patricia by the corporation as evidenced by its records was for services rendered. Arthur may not disclaim her right to it. A court of equity will protect the interest of one whose funds have been converted into a joint bank account after the parties have separated. Jones v. Hamilton, 211 Md. 371. The court finds that half of the money in said savings account in the Elkton Banking and

Trust Company belongs to Patricia, and Arthur will be ordered to account to her for it.

As for the Washington-Lee Savings and Loan Association joint savings account, it was opened on April 5, 1973, with the deposit of two checks issued by Arthur D. Hall, Inc., each for $10,000, one to Arthur on March 29, 1973, and the other to Patricia on March 30, 1973, and both representing 'commissions' paid to them for services rendered. On June 27, 1974, after the separation, Arthur withdrew the entire balance in said account in the amount of $21,213.30, and deposited it in the Arthur D. Hall, Inc., account in the Cecil National Bank on July 5, 1974. This money was never put in Arthur's personal account. Patricia's redress, if any, for this money which she claims is against the corporation, not Arthur. This matter is, therefore, not before this court in this case.

Yardley Savings & Loan Association account was originally in Arthur's name alone. On December 31, 1971, he opened an account in the amount of $20,000 in the names of 'Arthur D. Hall or Patricia R. Hall', and he retained the passbook. On September 4, 1973, Arthur withdrew the $21,630.38 balance in said account and closed it, and deposited same in a savings account in the Cecil National Bank, being Account No. 190877-4, in his name only on May 10, 1974. Patricia, who contributed nothing to this account, contends that Arthur gave her this account as a gift. The burden is on her to prove the gift. The proof is far from convicing. Furthermore, the law on the subject is clear as stated in Brewer v. Bowersox, 92 Md. 567, at page 570, where the Court said:

> '* * * where money belonging to one person and known to belong to him, is deposited by him in his own name and in the name of another, but subject to the order of either, and the depositor retains possession, control and dominion over

the pass-book or certificate without the production of which the fund cannot be drawn, he does not part with the ownership of the fund, and the other person becomes merely an agent of the real owner acquiring no interest in the fund at all and ceasing upon the death of the owner to have any authority whatever as agent. And the reason for this is apparent. The owner of the money can by his own act voluntarily part with his ownership of it only by gift, payment or bequest. Such a deposit as has just been named is obviously neither a bequest nor a payment, for it possesses none of the characteristics of either; and it cannot be a gift to the other person mentioned in the bank-book or the certificate, because if the depositor retains the book or the certificate he retains complete dominion over the fund. There can be no perfected gift where the supposed donor reserves a locus poenitentiae, and a locus poenitentiae is always reserved when the alleged donor may at any moment withdraw the fund from bank. * * *'

The Court, therefore, finds that as to the money in the Yardley account Patricia has no right or claim to it.

Finally, Patricia contends that she is entitled to her share (a half interest) in the yearly rental of $2,500 which Arthur has collected as a result of a lease of pasture land on their farm property and which he has heretofore deposited in his personal account. There is no evidence that Patricia ever questioned this arrangement. It was apparently done with her knowledge and acquiescence. She has no standing to claim it now. The rule is well settled that a wife is entitled to one half of the income from property held by the entireties. Wardrop v. Wardrop, 211 Md. 14. However, as the Court pointed

out in Colburn v. Colburn, 262 Md. 333, quoting from Grover v. Radcliff, 63 Md. 496:

'But if such money or other separate property of the wife has been received by the husband, with the knowledge and acquiescence of the wife, without such express promise at the time, no implied assumpsit, either legal or equitable, will arise to support a claim against the husband or his estate. The wife having the jus disponendi of her separate property, if she thinks proper to let her husband have it, or appropriate it, without any express promise or agreement at the time to account for or repay her the amount so received or appropriated, she cannot afterwards set up a claim against the husband upon the footing of a creditor. In such case she is taken to have acquiesced in the appropriation of the fund for the common benefit of herself and husband, or for the benefit of the family.'

The court therefore finds that the money received by Arthur as rental from the pasture land prior to the separation of the parties is his, and Patricia can make no claim to it now. However, he is accountable to her for one-half of any rentals accruing following the granting of a divorce in this case. By converting their interest in said property to that of tenants in common by virtue of this divorce, each remains entitled to a one-half interest in any income from the real estate.

The Court will require Arthur to pay to the attorneys representing his wife in this case a fee of $1,000, which the Court believes to be fair and reasonable considering the great amount of time and effort which they have undoubtedly expended in the preparation and presentation of her case, and at the same time considering the financial position of each of the parties.

The Court accordingly will sign a decree and order:

1) Granting a divorce a vinculo matrimonii to Patricia R. Hall.

2) Reserving unto Patricia R. Hall the right to alimony.

3) Declaring equal ownership of the personal property herein listed and ordering an equal division thereof between them. In the event the parties are unable to reach an amicable agreement with respect to the division of the household furnishings, the Court will order that these items be sold and the net proceeds from such sale be equally divided between the parties.

4) Declaring equal ownership in the savings account in the Elkton Banking and Trust Company, being No. 7-04387-9, and ordering an equal division of same between the parties.

5) Declaring the savings account No. 190877-4 in the Cecil National Bank to be the sole property of Arthur D. Hall.

6) Requiring Arthur D. Hall to pay a counsel fee of $1,000 to Lichter, Coleman & Rogers, Attorneys for Patricia R. Hall.

7) Requiring Arthur D. Hall to pay the Court costs in both cases.

J. Albert Roney, Jr.,
Judge

July 30, 1975"

An appropriate decree was thereafter signed by the chancellor on August 18, 1975. The appellant, Arthur D. Hall, III, filed a petition for rehearing on September 10, 1975, which was denied the same day. At the same time the chancellor conducted a hearing on the question of alimony and concluded that the appellee, Patricia R. Hall, was entitled to receive $115 per week as permanent alimony from

the appellant and a decree to that effect was signed on September 25, 1975.

It is contended that "the prayer of the appellant for an annulment should have been granted." He argues that "no overriding principles of justice or equity exist which would require a divorce to be granted rather than the pronouncement of a nullity." By the same token, we cannot find in the record any "overriding principles of justice or equity" which would compel the chancellor to grant an annulment rather than a divorce. He found as a fact, which is supported by the evidence, that there was no fraud on the part of the appellee which enticed the appellant to enter the marriage and that the appellant was not unaware of the appellee's prior social background. Appellant, as the chancellor phrased it, simply failed "to prove his allegation of fraud to entitle him to an annulment of his marriage * * *."[2]

Although appellant was not entitled to an annulment on the ground of fraud, he did, on the other hand, conceivably have grounds for an annulment if we assume, as appellant alleged and the chancellor apparently treated as proved, that his first marriage had not been legally dissolved at the time he entered into the marriage with the appellee. *Townsend v. Morgan*, 192 Md. 168 (1949); *see* Strahorn, *Void and Voidable Marriages in Maryland and Their Annulment*, 2 Md. L. Rev. 211, 225 (1938). Thus, the chancellor, as he recognized, was confronted with a choice of avenues to pursue in dissolving the marriage. As we see it, the chancellor had a certain freedom of choice as to the direction he would take and unless he has abused that discretion, his action will not be set aside on appeal.

In appraising the course of action taken by the chancellor, it must be borne in mind, according to 3 W. Nelson, *Divorce and Annulment* § 31.05 (2d ed. 1945):

> "The law does not favor annulments of marriages, and it has long been a settled judicial

---

**2.** As a matter of fact, it was stipulated "that there was no fraud" by either party.

policy to annul marriages only under circumstances and for causes clearly warranting such relief. It has been reasoned that more serious consequences, of a social and pecuniary nature, may result from a decree of annulment than from a decree of divorce, and that the vigilance with which the law guards the marital status should accordingly be intensified when an attack is made against its validity from the very beginning." [Footnotes omitted.]

Moreover, by pursuing the divorce route rather than the annulment route, the chancellor avoided some of the pitfalls inherent in an annulment action. *See* Strahorn, *Fifteen Years of Change in Maryland Marriage and Annulment Law and Domestic Relations Changes*, 13 Md. L. Rev. 128, 133-36 (1953). Nelson, *supra*, at § 31.15 states:

"It has been observed that, as a matter of public policy a court should, at the first opportunity, enter its decree annulling a marriage where one of the parties thereto had a spouse at the time of the marriage. Many decisions, however, evince a judicial reluctance to annul marriages for this cause. According to the trend of present-day authority, if naught appears but that a marriage is bigamous, a court may doubtless declare it to be null and void; but if there are circumstances justifying such action, an annulment may be denied for 'equitable reasons.' So an annulment sought because the wife had another husband living has been refused where the impediment was removed either by the death of the first husband or by the procurement of a divorce terminating the first marriage, before suit for annulment was brought by the second husband, who, after such death or divorce and with knowledge of the former undissolved marriage, had continued to live with her for a period of time as her husband." [Footnotes omitted.]

Here, of course, "the impediment" of the first marriage

was removed when the appellant obtained a valid divorce from his first wife in December, 1973, long before he instituted the annulment proceedings.

Looking at the overall picture presented by the conduct and relations of the parties, both prior to and after their purported marriage, we cannot find that the chancellor violated any overriding principles of justice or equity in denying appellant's petition for annulment and in granting the appellee a divorce a vinculo matrimonii. Otherwise stated, we cannot say, upon reviewing the totality of the circumstances, that there was any abuse of the chancellor's discretion.

We turn next to the contention that "The appellee was not entitled to an award of alimony either as an incident to an annulment of the marriage or to a divorce." Having concluded that the chancellor committed no error in denying appellant's application for an annulment, the only remaining issue in this regard is whether the chancellor erroneously awarded appellee alimony following a finding that she was entitled to a divorce a vinculo matrimonii. We think he did not.

That alimony may be granted following a divorce on the ground that the marriage is a nullity was established in *Clayton v. Clayton,* 231 Md. 74 (1963). And it is clear that the chancellor in concluding that appellee was entitled to alimony adhered to the guidelines set forth by the Court of Appeals in *Flanagan v. Flanagan,* 270 Md. 335 (1973), and took into consideration the factors enumerated in the keystone case of *Timanus v. Timanus,* 178 Md. 640 (1940). He recognized "that fault is one of several factors to be considered in properly awarding alimony in a nonculpatory divorce * * *," *Flanagan v. Flanagan, supra,* at 340; and he found the appellee free of fault. On the record before us we cannot quarrel with that conclusion. Thus, we find the contention that appellee was not entitled to alimony as an incident of the divorce to be without merit.

The appellant next contends that "the issue of the ownership of the real estate was not properly before the Court and its ownership should not have been determined in

the decree." Since the decree contains no reference to the ownership of the parties' real estate, it is clear that the chancellor did not determine the ownership of the real property. It is true that in the course of his opinion the chancellor stated:

> "It is well settled that the effect of the granting of a divorce upon real estate held by the parties as tenants by the entireties is to convert their respective interests therein to that of tenants in common."

This is simply a correct statement of the law. *Tucker v. Dudley*, 223 Md. 467 (1960). The contention is without merit.

The appellant makes separate contentions (IV — VII) that there was insufficient evidence to support the chancellor's findings that the household furnishings were jointly owned; that the appellant had made a gift to the appellee of their jointly registered stock holdings; that appellee was entitled to a division of the assets of "the brokerage account"; and that the appellee was entitled to an interest in the Elkton Banking and Trust Company savings account. We have carefully scrutinized the record before us and find that the evidence supports the finding of the chancellor that the appellee sustained her burden of proving ownership of the property. *Woodall v. Woodall*, 16 Md. App. 17 (1972).

It is next contended that "The refusal to grant the appellant a rehearing denied him a substantial right." In support of this contention, it is argued that counsel for appellant at the original trial could not reasonably anticipate that the chancellor would "predicate his award of alimony on the appellant's reneging on his promise to remarry the appellee." The further argument is advanced that "counsel who appeared for the appellant at the hearing of September 10, 1975, (when appellant's petition for rehearing was denied and alimony to the appellee awarded) was not the counsel who had tried the case originally. New counsel had been sought and engaged." We find neither of these arguments persuasive. The granting of a rehearing was within the sound discretion of the chancellor and we

find no abuse thereof. *Austin v. Austin,* 234 Md. 393 (1964); *Mack Trucks, Inc. v. Webber,* 29 Md. App. 256 (1975).

We find no merit in the contention that the chancellor erred at the hearing on September 10, 1975, in refusing to permit appellant "to introduce evidence bearing upon non-economic factors which would affect Patricia's [appellee] right to an award of any alimony." It is clear as the chancellor announced in his opinion following the hearing on September 10, 1975, that he had concluded on the basis of evidence produced at the original hearing that the appellee "was entitled to receive alimony, provided she could justify the need for it. That was the purpose of this proceeding today, to determine whether or not she has a need for alimony and, if so, in what amount."

The chancellor went on to say:

> "In considering that question, the Court is required to follow the guidelines that have been expressed in many cases before the Court of Appeals on this subject, such as the husband's wealth, earning capacity, financial circumstances of the parties, the age and station in life, physical condition of the wife, her ability to work, the length of time that the parties lived together, circumstances leading up to the separation, fault which destroyed the home, and so forth."

This was an accurate delineation of the guidelines governing the amount of alimony to be awarded and from our review of the record, the chancellor followed them substantially to the letter. In our opinion, the award to the appellee of alimony in the amount of $115 per week was entirely appropriate and in no way "excessive" as appellant contends.

> *Decree affirmed; costs to be paid
> by appellant.*