# TIMOTHY L. FEEHLEY

## *vs.*

# MARY K. FEEHLEY.

*Marriage: Religious ceremony necessary; license; failure to procure, does not invalidate.*

In Maryland, some religious ceremony must be superadded to the civil contract in order that a marriage may be valid.

p. 568

But the law does not prescribe the form, nor according to the rite of what church, the marriage shall be celebrated.    p. 568

Failure to procure a marriage license does not have the effect of rendering the marriage void.                         p. 570

A Catholic priest (a duly ordained minister, in the formal exercise of his sacred office) and a man and woman before him, understood that he was officiating there in order that they might live together again in lawful wedlock, they being a husband and wife who had been divorced. The words and emblems he employed were strictly appropriate to that object. The sole purpose of his presence and ministration was to give religious sanction to their reunion: *Held,* that the result was effectually accomplished, and the validity of the re-marriage was not open to question on the ground that it was not solemnized by a religious ceremony, although no license was obtained.       p. 568

*Decided December 13th, 1916.*

Appeal from Circuit Court No. 2 of Baltimore City. (BOND, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Philip L. Sykes* (with whom were *Emanuel M. Baum* and *Wm. H. Lawrence* on the brief), for the appellant.

*J. Richard Standiford* and *Edwin T. Dickerson,* for the appellee.

URNER, J., delivered the opinion of the Court.

The appellant and appellee were married in November, 1891. A daughter was born as a result of their union. In September, 1896, they were divorced. Fifteen years later, at the instance of the daughter, then grown to young womanhood, they were re-united. There were intervening marriages by both parties which were dissolved by judicial decree, the appellant having had one, and the appellee two, such intermediate experiences. The re-union occurred in September, 1915. In October of the following year the appellee filed her bill of complaint against the appellant for alimony, and for the division and adjustment of their joint property interests, on the ground that she had been forced from their home by his cruelty and vicious conduct. The main defense to the suit is based upon the theory that the parties were not lawfully re-married and therefore do not sustain the relationship upon which the right to maintain the suit is predicated.

For some months prior to the time when the re-marriage is alleged by the bill to have occurred, the appellant was liv-

ing as a boarder at the home of the appellee and of their
daughter.   The question of their being married again had
been under consideration and the appellant was inclined to
the opinion that no ceremony was necessary inasmuch as they
were both Catholics, and in the view of their church the
original marriage was still subsisting. . On the occasion, how-
ever, of a call at the home by the priest of the parish, a
ceremony was performed upon whose nature and effect de-
pends, in large measure, the decision of the present con-
troversy.   It is to be determined whether a marriage was
then celebrated with religious rites, and if so, whether it
should be held to be valid notwithstanding the conceded fact
that no license for the marriage had been obtained as re-
quired by law.

The appellee and her daughter both testified that on the
occasion in question a wedding ceremony was performed in
full accordance with the ritual of the Catholic Church, that
the priest placed his stole about his neck, had some holy
water brought and a ring produced, and, taking a book from
his pocket, read the service and solemnized the marriage in
the customary form, including the usual questions and an-
swers as to the mutual consent of the parties, and concluded
with a blessing and the declaration that they were now hus-
band and wife.   The appellant testified that the ceremony
was not a marriage, but simply a blessing.   He stated that
something in Latin was said by the priest and that holy water
and a ring were used.   The testimony of the priest was to
the effect that he could not re-marry the parties because the
church does not recognize a divorce, and therefore the first
marriage, which was solemnized in the church, was to be
regarded as being still in force, but that he pronounced a
blessing upon their agreement to resume the relations of
matrimony.   He said that he could not recall exactly what he
did on that occasion.   In answer to the question as to what
it was his intention to do, he said: "Just to have them become
husband and wife."   He thought that he may have put on

his stole, and that a ring was in fact used when they were asked to renew their consent, but he could not recall whether or not holy water was brought and applied.

It is the settled law of this State that "some religious ceremony" must be "superadded to the civil contract" in order that a marriage may be valid. "The law, however, does not prescribe the form, nor according to the rites of what church, the marriage shall be celebrated." *Denison* v. *Denison*, 35 Md. 380. Upon the evidence in the Record before us there can be no doubt that there was a ceremony in connection with the event now under inquiry, and that it was religious in its character. It was conducted by a duly ordained minister in the formal exercise of his sacred office. It was unquestionably intended to be an essential feature of the new marital agreement into which the parties were entering. The priest, and the man and woman before him, understood that he was officiating there in order that they might live together in lawful wedlock. The words and emblems he employed were strictly appropriate to that object. The sole purpose of his presence and ministration was to give religious sanction to their re-union. In our judgment that result was effectually accomplished, and the validity of the re-marriage is not open to question on the ground that it was not solemnized by a religious ceremony.

The contention that the failure to secure a license rendered the marriage void must likewise be overruled. While the statute provides that no persons within the State "shall be joined in marriage until a license shall have been obtained from the clerk of the Circuit Court for the county in which the marriage is to be performed, or if in Baltimore City, from the clerk of the Court of Common Pleas," or unless banns shall have been published as therein described, or except in the case of marriages according to the ceremony used by the Society of Quakers, and while punishment by fine is directed to be imposed upon ministers and others who marry persons without a license, there is no purpose expressed

in the statute that a marriage otherwise validly contracted
and celebrated shall be void if the prescribed license shall not
have been procured. *Code,* Art. 62, secs. 4, 11. On the con-
trary, there is an implied recognition of the efficacy of mar-
riages solemnized without a license in the provision that a
minister who shall "marry" persons in the absence of such
official authorization shall be subjected to the stated pen-
alty. The requirement of a license preliminary to marriage
is wholly of statutory origin. At common law, according to
the decisions of this Court, a religious ceremony, in celebra-
tion of the civil contract, was sufficient to make the marriage
lawful. *Denison* v. *Denison, supra; Richardson* v. *Smith,*
80 Md. 93; *Jackson* v. *Jackson,* 80 Md. 187. In view of the
important considerations of morality and legitimacy involved,
it is manifestly a sound and just rule of construction that
statutes providing for marriage licenses are not held to have
the effect of nullifying, for non-compliance with their terms,
a marriage valid at common law, unless such an intention
is plainly disclosed. This salutary principle has been applied
in numerous decisions. There are differences of judicial
opinion in various jurisdictions as to what are the essential
features of a marriage under the rules of the common law, but
the courts are generally in accord upon the proposition that
a statutory provision for license to marry should not be re-
garded as mandatory, and vital to the validity of a marriage,
in the absence of a clear indication of a legislative purpose
that it should be so construed. *Meister* v. *Moore,* 96 U. S.
76; *Hutchins* v. *Kimmell,* 31 Mich. 126; *Cartwright* v.
*McGown,* 121 Ill. 388; *Milford* v. *Worcester,* 7 Mass. 48;
*Parton* v. *Hervey,* 1 Gray, 119; *Askew* v. *Dupree,* 30 Ga.
173; *State* v. *Parker,* 106 N. C. 711; *In Re Love's Estate,*
42 Okla. 478, 142 Pac. 305; *Chapman* v. *Chapman,* 11 Tex.
Civ. Appls. 392; *Connors* v. *Connors,* 5 Wyo. 433; *Frank-
lin* v. *Lee,* 30 Ind. Appls. 31; *Sabalot* v. *Populus,* 31 La.
Ann. 854; *Damon's Case,* 6 Me. 148; *Stevenson* v. *Gray.*
17 B. Monroe, 193; *Snuffer* v. *Karr,* 197 Mo. 182. The

rule is stated, and cases supporting it are collected, in: *Harlan on Domestic Relations,* 25-26; *Bishop on Marriage, Divorce and Separation,* Vol. 1, secs. 424-6; 2 *Greenleaf on Evidence,* sec. 460; 26 *Cyc.* 850-1; and in notes to *Landry* v. *Bellanger* (La.), 15 L. R. A. (N. S.), 463, and *Reaves* v. *Reaves* (Okla.), 2 L. R. A. (N. S.), 353.

The regulative purposes of the license statute are useful and important, but they are sought to be enforced by pecuniary penalties pronounced against those officiating at unlicensed marriages, and not by the radical process of rendering void and immoral a matrimonial union otherwise validly contracted and solemnized. In order to obviate such a result it has been decided by this Court that even the statutory provision expressly declaring void any marriage contracted within the prohibited degrees of relationship, did not have the effect of making absolutely void a marriage of uncle and niece, contrary to its terms, but rendered the marriage voidable only by judicial decree passed during the lifetime of the parties. *Harrison* v. *Harrison,* 22 Md. 468. That case was said by CHIEF JUDGE BOYD, in *Dimpfel* v. *Wilson,* 107 Md. 337, to show the "anxiety of our predecessors to protect innocent issue from being pronounced illegitimate, by not being willing to declare such marriages void *ab initio,* notwithstanding the language used in the statute, when other parts of the statute and the circumstances permitted a construction which made them only voidable." The ruling in *Harrison* v. *Harrison* was followed in the very recent case of *Fensterwald* v. *Burk,* 129 Md. 131. The problem of statutory construction now presented is simpler than the one to which those cases referred, and it is readily solved upon the theory that the Act does not profess to make the validity of a marriage depend upon the procurement of a license. The principle that such provisions are directory only, has been adopted in jurisdictions where a religious ceremony is not regarded as an essential element of a marriage according to the common law, and it would seem that in a State like our

own, where this additional sanction and safeguard is required, there is even stronger reason for the rule that the validity of such a marriage should be sustained.

The decree appealed from was passed in pursuance of a decision that the marriage was valid, and that a sufficient ground for the allowance of alimony and the adjustment of the property rights of the parties had been shown by the proof. No question has been raised on appeal as to the propriety of the decree with respect to the affirmative relief it grants, except upon the theory that the plaintiff and defendant are not legally married. Upon the facts and the law we are of the opinion that the decree in all respects is proper and just.

*Decree affirmed, with costs.*