**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 749

September Term, 2014

_____

MARGUERITE R. MORRIS, PERSONAL
REPRESENTATIVE OF THE ESTATE OF
KATHERINE SARAH MORRIS

v.

ISAAC JEROME GOODWIN
_____

Woodward,
Kehoe,
Arthur,



JJ.
_____

Opinion by Woodward, J.
_____

Filed:  October 26, 2016

Appellant, Marguerite R. Morris, personal representative of the estate of her daughter, Katherine Sarah Morris, filed a *pro se* petition to annul Katherine's marriage to appellee, Isaac Jerome Goodwin, in the Circuit Court for St. Mary's County. Appellant alleged that the marriage was based on fraud. The circuit court dismissed her petition with prejudice on the grounds that appellant did not have standing to sue for the annulment of Katherine's marriage to appellee.

Appellant presents two questions for our review, which we have slightly rephrased:

1. Does a personal representative have standing to prosecute a petition for annulment of the decedent's marriage on the basis of fraud?

2. Did the circuit court err in not granting appellant a hearing before dismissing her petition for annulment for failing to state a claim upon which relief can be granted?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## BACKGROUND

On August 3, 2011, Katherine married appellee in Arlington County, Virginia. At that time, appellee was a U.S. Army Staff Sergeant stationed at Fort Bragg, North Carolina. Katherine was a fourth-year student at the University of Maryland, College Park. Following the wedding, appellee returned to Fort Bragg, and Katherine continued to reside on campus. Katherine committed suicide on or about May 6, 2012.[1] On September 11, 2012, appellant was appointed personal representative of Katherine's estate by the

---

[1] On Saturday, May 5, 2012, Katherine walked out of her College Park apartment at approximately 5:45 p.m. Her body was found in the early morning hours of May 6, 2012, in a parking lot at Arundel Mills Mall.

Orphans' Court for St. Mary's County.

On June 14, 2013, appellant, acting *pro se*, filed in the circuit court a petition to annul Katherine's marriage to appellee on the basis of appellee's fraud.[2] Appellant alleged in her petition that appellee (1) married Katherine in order to increase his military housing allowance, (2) "continued his sexual relationships with several other women during the course of the marriage[,]" and (3) never shared his military benefits with Katherine "until [appellee] was ordered to do so by military superiors[.]" According to the petition, appellee "received an Article 15 from the United States Army for misappropriation of government funds" in June of 2011, and in July of 2011 "financial sanctions were levied on [appellee] of $545 a month and his Basic Allowance for Housing was reduced to approximately $409 a month." Appellant also alleged that as a result of his marriage to Katherine, appellee "kept for his own personal use approx[imately] $700 a month allowance and did not provide any care or benefits to Katherine[.]" Finally, appellant acknowledged in the petition that Katherine "by her own admission discovered that [appellee] married her for fraudulent reasons."[3]

On June 26, 2013, appellant filed an Emergency Motion to Post Summons Due to Evasion of Service. Appellant's motion was supported by an affidavit of a process server

---

[2] Appellant alleges two additional grounds: extreme cruelty, and failure to honor fiduciary duties. It is doubtful that these two alternate grounds are valid grounds for annulment. *See* Cecily Fuhr, *Cause of Action to Annul Marriage*, in 65 CAUSES OF ACTION 2d 617 at §§ 6-22, p. 642-63 (2014, 2016-17 Supp.) (outlining the various grounds for annulment).

[3] Appellant also knew about appellee's fraud, because she alleged in the petition that Katherine "stated before her death that she had been defrauded by [appellee]."

stating that appellee was evading service. The next day, the circuit court denied appellant's emergency motion, but, in a separate order, ordered that service be made by mail. On July 10, 2013, an Affidavit of Process Server was filed, stating that service was made on appellee by first class mail on June 28, 2013.

When no responsive pleading was filed by appellee, appellant filed a "Motion for Judgement [sic] by Default" on August 28, 2013. The circuit court denied appellant's motion two days later. On September 10, 2013, appellant filed a Motion for Reconsideration and Hearing on Judgment by Default. The court denied appellant's motion on October 3, 2013, adding a handwritten note on the order: "Default inappropriate. Set in for hearing."

On October 9, 2013, an attorney entered his appearance on behalf of appellant and filed a Request for Order of Default. No action was taken by the clerk of the court on appellant's request. On November 22, 2013, appellant filed a request for a hearing on the Order of Default. Again, no action was taken by the clerk of the court on appellant's request. On November 26, 2013, appellant's attorney filed a motion to withdraw his appearance on behalf of appellant. The circuit court never ruled on the motion to withdraw.

On December 30, 2013, the circuit court sent a Notification of Contemplated Dismissal, stating that the case "will be 'DISMISSED FOR LACK OF JURISDICTION OR PROSECUTION WITHOUT PREJUDICE[,]'" unless appellant filed a motion showing good cause within thirty days. On January 8, 2014, appellant filed a Motion Not to Dismiss, a second Request for Order of Default, and a second request for a hearing on the Request for Order of Default. In her motion, appellant asserted that Maryland Rule 2-

3

507 did not apply, because "it has not been one year since the last docket entry[,]" and service on appellee had been effected fourteen days after the filing of the petition.

On June 5, 2014, without holding a hearing, the circuit court issued a Memorandum Opinion and Order, dismissing appellant's petition for annulment with prejudice, because appellant lacked standing to sue for annulment of Katherine's marriage to appellee. Appellant filed her notice of appeal on June 30, 2014.

## STANDARD OF REVIEW

Appellate review of a trial court's dismissal of a complaint is *de novo*. *See Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 142 (2012). An appellate court reviews only "the four corners of the complaint and its incorporated supporting exhibits, if any." *Forster v. Office of Pub. Defender*, 426 Md. 565, 604 (2012). "[A]ll well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them," are viewed in a light most favorable to the plaintiff. *Gomez*, 427 Md. at 142. An appellate court need not consider "bald assertions [or] conclusory statements," and construes against the plaintiff "[a]ny ambiguity or uncertainty in the [factual] allegations[.]" *Forster*, 426 Md. at 604; *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 335 (2009). The dismissal will be upheld "only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted." *Gomez*, 427 Md. at 142. An appellate court may affirm the dismissal "on any ground adequately shown by the record, whether or not relied upon by the trial court." *Id.* (internal quotation marks omitted).

4

## DISCUSSION

## I. Annulment

Appellant argues that she, as personal representative, has standing to prosecute on Katherine's behalf a petition for annulment of Katherine's marriage to appellee. Appellant relies on two out-of-state cases, *Clark v. Foust-Graham*, 615 S.E.2d 398 (N.C. Ct. App. 2005), *cert. denied sub nom.*, *Goodwin v. Smith*, 670 S.E.2d 563 (N.C. 2008), and *Schaub v. Schaub*, 162 P.2d 966 (Cal. Ct. App. 1945), for such proposition. According to appellant, even though annulment is disfavored in Maryland, "this case and the fraud perpetuated upon the decedent resulting in her death surely me[ets] a level warranting such relief." Appellant contends that she has the authority under Maryland Code Section 7-401(y) of the Estates and Trusts Article to "stand for the Decedent in any action[.]" *See* Md. Code (1974, 2011 Repl. Vol., 2016 Supp.), § 7-401(y) of the Estates and Trusts Article ("ET"). Appellant further argues that, even though Maryland courts have held that the death of a party abates a divorce action, such holding does not preclude her claim, because "actions for divorce are not the same as actions for annulment."

### A. Authority of Equity Court to Grant an Annulment

In *Hall v. Hall*, this Court noted Maryland's policy disfavoring annulments:

> **The law does not favor annulments of marriages, and it has long been a settled judicial policy to annul marriages only under circumstances and for causes clearly warranting such relief**. It has been reasoned that more serious consequences, of a social and pecuniary nature, may result from a decree of annulment than from a decree of divorce, and that the vigilance with which the law guards the marital status should accordingly be intensified when an attack is made against its validity from the very beginning.

5

32 Md. App. 363, 381-82 (1976) (emphasis added) (internal quotation marks omitted), *superseded on other grounds by statute*, Divorce and Annulment Act, ch. 491, 1983 Md. Laws 1496 (1983) (codified as amended at Md. Code (1984, 2012 Repl. Vol., 2016 Supp.), § 7-103 of the Family Law Article ("FL")), *as recognized in Ledvinka v. Ledvinka*, 154 Md. App. 420, 435 (2003).

In *Ledvinka*, we traced the authority of the circuit court to decide annulment actions:

> In the Act of 1777, ch. 12, § 15, the Maryland legislature first granted the general court the authority to "inquire into, hear and determine, either on indictment, or petition of either of the parties, the validity of any second marriage, the first subsisting, null and void." *Ridgely v. Ridgely*, 79 Md. 298, 303, 29 A. 597 (1894). This authority was later transferred to the courts of equity by the marriage Act, Md. Code (1860), Art. 60, § 25. *Id.* In *LeBrun v. LeBrun*, 55 Md. 496 (1881), the Court reviewed the three means of conferring authority on a court of equity to declare a marriage null and void. **The first basis of authority is the general jurisdiction of the court of equity in matters of fraud affecting contracts, that is, marriages procured by abduction, terror, fraud, or duress**. *Id.* at 503. The second basis is the marriage Act discussed above. *Id.* And the third basis is by the authority of the divorce laws, Md. Code (1860), Art. 16, § 25, which permitted a divorce *a vinculo matrimonii* (essentially, an absolute divorce), on the ground that the marriage was void *ab initio*. **Today the courts of the State derive their authority to grant an annulment from the general jurisdiction of the equity courts.** Md. Code (1984, 1999 Rep. Vol.), § 1-201(a)(3) of the Family Law Article.

*Id.* at 434 (emphasis added).

As stated in *Ledvinka*, fraud is one of the grounds for annulment. In *Picarella v. Picarella*, this Court set forth the parameters for an annulment based on fraud:

> The Court in *LeBrun v. LeBrun*, *supra*, put it thus, [55 Md.] at 503: "If the marriage be procured by abduction, terror, fraud, or duress, the court, in declaring it a nullity, acts in virtue of its general jurisdiction in matters of fraud affecting contracts . . . ." *Ridgely v.*

6

*Ridgely*, *supra*, added *a proviso*. **Observing**, [79 Md.] at 307 [ ], the status in the eye of the law of **marriage as a civil contract**, it said: "Being then a contract, it seems to follow that **where it has been procured by fraud or duress, it may be set aside by a court whose inherent jurisdiction gives it authority to annul any ordinary contract procured in the same way; provided the application be promptly made and before a consummation of the marriage by voluntary cohabitation**." *Oswald v. Oswald*, *supra*, [146 Md.] at 316 [ ], apparently expanded the nature of the fraud: "A marriage may be annulled by a court of equity in this State when it is procured by abduction, terror, fraud or duress, or when the fraud complained of relates to essential matters affecting the health or well[-]being of the parties themselves."

20 Md. App. 499, 506 (1974) (emphasis added) (citations omitted). In summary, circuit courts have the authority to hear and decide annulment petitions on the basis of fraud, but annulments of marriage are disfavored in the law.

B. Distinction Between Void And Voidable Marriages

Maryland, like the majority of jurisdictions, has recognized the distinction between "void" and "voidable" marriages. *See Picarella*, 20 Md. App. at 507-08 n.9; *see* Cecily Fuhr, *Cause of Action to Annul Marriage*, in 65 CAUSES OF ACTION 2d 617 at § 3, p. 636 (2014, 2016-17 Supp.) ("Marriages subject to annulment typically fall into one of two types: voidable marriages and void marriages."). The main difference between void and voidable marriages is "whether, with proper consent, the parties could have established a valid marriage. If not, the marriage is considered void." Fuhr, 65 COA 2d 617, § 3, p. 638. For example, bigamous and incestuous marriages are void marriages, because they are invalid regardless of the parties' consent. *Id.*; *see also* FL § 2-202 (listing categories of marriage that are void in Maryland). "If, on the other hand, the parties could have lawfully married had one or the other party's consent to the marriage not been legally

7

ineffective, the marriage is voidable rather than void." Fuhr, 65 COA 2d 617, § 3, p. 630. Thus, "a marriage procured by duress or exertion of undue influence" is voidable, because the defect in the marriage goes to a party's consent. *Id.* § 3, p. 628.

Maryland courts, however, have not explicitly stated whether a marriage procured by fraud is void or voidable. *See Sackman v. Sackman*, 236 Md. 237, 240 (1964) ("We need not pause to consider in what cases fraudulent concealment of premarital misconduct would fall within [the void] classification or merely render the marriage voidable."). Looking at decisions from jurisdictions outside of Maryland, we see that, in the absence of statutory provisions to the contrary, a majority of those decisions hold that a marriage procured by fraud is voidable, rather than void. *See, e.g.*, *Sandhu v. United States*, 916 F. Supp. 2d 329, 334 n.7 (E.D.N.Y 2013) ("Under New York law, '[a] marriage procured by fraud is voidable[.]'"); *In re Estate of Randall*, 999 A.2d 51, 53 (D.C. 2010) (stating that under the D.C. Code, voidable marriages include "marriages procured by fraud or force"); *Johnson v. Sands*, 53 S.W. 2d 929, 930 (Ky. 1932) (stating that under Kentucky law, "a marriage procured by fraud or duress is not void but voidable"); *see also* W. W. Allen, Annotation, *Right to Attack Validity of Marriage After Death of Party Thereto*, 47 A.L.R.2d 1393 § 9 (1956) ("It is evident that marriages induced by fraud, and also, in most jurisdictions, those obtained by duress . . . are voidable only.") (citations omitted). Legal scholars also concur with the view that "[a] marriage procured by fraud is generally voidable rather than void." Fuhr, 65 COA 2d 617, § 14, p. 655; *see* John S. Strahorn, Jr., *Void and Voidable Marriages in Maryland and Their Annulment*, 2 Md. L. Rev. 211, 244 (1938) (stating that, if "a spouse's consent to the marriage ceremony was induced by a

8

fraudulent misrepresentation as to or concealment of a fact material to the marriage relation, the marriage is at least voidable by proceeding on the theory of fraud in the procurement"). This Court agrees with the general principle that a marriage procured by fraud is voidable, not void, because a marriage procured by fraud goes to the legal efficacy of the party's consent, rather than whether the parties could have established a valid marriage.

### C. Standing to Prosecute an Annulment of a Marriage Based on Fraud

Having decided that a marriage based on fraud is voidable, the next questions raised are when and by whom may a suit for an annulment of such marriage be brought? This Court has answered the first question by stating in *dicta* that voidable marriages may only be challenged while the married parties are still alive. *See Picarella*, 20 Md. App. at 507-08 n.9 ("'Voidable' expresses the idea that the defect, at most, subjects the marriage to direct attack under appropriate procedure during the joint lives of the parties."). It follows then that no action for an annulment of a voidable marriage for fraud can be brought after the death of one of the parties to the marriage. *See Gibbons v. Blair*, 376 N.W.2d 22, 24 (N.D. 1985) (observing that "[t]he nearly universal majority rule . . . holds that marriages which are voidable for fraud can be annulled only during the lifetime of the parties to the marriage") (citations omitted); *see also* 4 Am. Jur. 2d <u>Annulment of Marriage</u> § 57 (2007) (stating that "the right to annulment of a marriage which is voidable only is a personal right and proceedings for annulment must be brought during the lifetime of both parties to the marriage").

Who may bring an action for annulment of a marriage based on fraud raises the

9

issue of standing. "The doctrine of standing is an element of the larger question of justiciability and is designed to ensure that a party seeking relief has a sufficiently cognizable stake in the outcome so as to present a court with a dispute that is capable of judicial resolution." *Kendall v. Howard Cty.*, 431 Md. 590, 603 (2013) (internal quotation marks omitted). In an action for an annulment of a marriage, the general rule is that, "[w]here a marriage is voidable rather than void, only a party to the marriage normally has standing to seek an annulment." Fuhr, 65 COA 2d 617, § 30, p. 679; *see* 4 Am. Jur. 2d Annulment of Marriage § 59 (stating that "[t]he right to annul a voidable marriage is a personal right and the action for annulment of such a marriage can be maintained only by a party to the marriage contract").

Thus, "[a]n action to annul a marriage on the ground of fraud can only be brought by the defrauded spouse while both parties to the marriage are living. It cannot be annulled at the suit of the heirs of the spouse imposed upon or other third persons." 4 Am. Jur. 2d Annulment of Marriage § 60 (footnote omitted). Similarly, "[s]ince a right to seek annulment of a marriage that is only voidable lapses with the death of either spouse, *an executor of necessity lacks the power to seek annulment of a voidable marriage*." Fuhr, 65 COA 2d 617, § 30, p. 680 (emphasis added); *see In re Estate of Davis*, 640 P.2d 692, 693 (Or. Ct. App. 1982) (stating that "[t]he general law is that a third party, such as an executor, may not object to, or have disallowed, a voidable marriage" (footnote omitted)).

In states that prohibit personal representatives or other third parties from prosecuting an action for an annulment of a marriage, some courts base that decision on their states' annulment statutes, while others rely on common law principles. *Compare Rodenhiser v.*

10

*Duenas*, 818 N.W.2d 465, 471-72 (Mich. Ct. App. 2012) (interpreting Michigan statutes to hold that personal representatives do not have standing to maintain annulment actions for their decedents), *cert. denied*, 820 N.W.2d 777 (Mich. 2012), *and Gibbons*, 376 N.W.2d at 24-25 (analyzing the North Dakota annulment statute to hold that a third party may not bring an annulment action "on behalf of a spouse injured by fraud"), *with Davidson v. Davidson*, 151 N.W.2d 53, 55 n.1, 57 (Wis. 1967) (relying on common law to foreclose a personal representative's action for an annulment on voidable grounds in Wisconsin), *and Arnelle v. Fisher*, 647 So. 2d 1047, 1048-49 (Fla. Dist. Ct. App. 1994) (citing Florida case law to hold that a third party could not prosecute an annulment action on grounds of undue influence, because such voidable ground abated upon the party's death).

States that permit personal representatives or other third parties to prosecute an annulment typically rely on annulment statutes that explicitly provide for such standing. *See, e.g.*, *Clark*, 615 S.E.2d at 401 (interpreting North Carolina's annulment statute "to bar a postmortem annulment action brought by a sufficiently interested party only if (1) one of the spouses in a void or voidable marriage has died, *and* (2) the marriage was followed by cohabitation and the birth of issue"). Only one state, Louisiana, has held that a personal representative has standing to prosecute the annulment of a decedent's marriage without a statutory provision specifically authorizing such action for an annulment. *See Succession of Ricks*, 893 So. 2d 98, 100 (La. Ct. App. 2004) (holding, without analysis of the void/voidable distinction, that the statute providing that the "succession representative is the proper plaintiff to sue to enforce a right of the deceased" includes annulment actions). Therefore, the general rule is that, unless a statute explicitly provides to the contrary, a

11

personal representative may not prosecute an action for annulment of the decedent's marriage based on fraud, because such marriage is voidable, not void, and voidable marriages may be annulled only during the joint lives of the parties to the marriage.[4]

The California Second District Court of Appeal explained the policy reasoning behind limiting standing to annul a voidable marriage to the married parties: "If the parties who are alone recognized by the statutes as entitled to have the marriage annulled do not, during its existence, see fit to avoid it, a stranger to the marriage should not be permitted to question its validity in a collateral proceeding." *Pryor v. Pryor*, 99 Cal. Rptr. 3d 853, 860-61 (Cal. Ct. App. 2009) (citations and internal quotation marks omitted). In *Gibbons*, the Supreme Court of North Dakota expressed a similar policy judgment and applied that policy to an action to annul a marriage on the ground of fraud:

> The majority rule is soundly based on the public policy that regards the marriage contract as so uniquely personal that any action to annul or dissolve it cannot be commenced after the death of either of the parties to the marriage unless the validity of the marriage is challenged on a ground that made the marriage absolutely void rather than voidable. Applying the majority rule and rationale to the facts of this case, we hold that an action to annul a marriage on the ground of fraud can only be brought by the defrauded spouse while both parties to the marriage are living.

*Gibbons*, 376 N.W.2d at 25.

---

[4] Conversely, courts have ruled that void marriages may be challenged by third parties after the death of one of the married parties. *See In re Estate of Davis*, 640 P.2d 692, 693 (Or. Ct. App. 1982) ("A void marriage, on the other hand, is invalid from the outset and may be challenged by third parties."); *Abel v. Waters*, 373 So. 2d 1125, 1128 (Ala. Civ. App. 1979) ("Clearly, the contention is that this was an invalid marriage, void *ab initio*. It is therefore clear to this court that in this instance, on the grounds alleged by the personal representative, an annulment action can be maintained after the death of one of the parties.").

We agree that the majority rule is based on sound public policy, because a marriage is so "uniquely personal" that any challenge to the validity of the marriage on a voidable ground, such as fraud, can be brought only by a party to the marriage during the joint lives of the married parties. Therefore, this Court holds that a personal representative does not have standing to bring a suit to annul the marriage of the decedent on the ground of fraud.

Nevertheless, appellant relies on *Schaub* and *Clark* for the proposition that a personal representative has standing to prosecute an action for annulment of the decedent's marriage. Both cases, however, involve annulment actions that were initiated before the decedent's death; the personal representatives were allowed to be substituted as parties in the already ongoing proceedings. In *Schaub*, the husband had obtained a judgment annulling his marriage based on fraud. 162 P.2d at 967. After the wife appealed, the husband died, and his personal representative was substituted as plaintiff and appellee. *Id*. at 967-68. The wife did not raise the issue of the personal representative's standing, nor did the California appellate court address it when it affirmed the judgment of annulment. *Id*. at 967-68, 974.

Similarly, in *Clark*, the annulment action was initiated on the husband's behalf by his daughter and guardian *ad litem* while the husband was still alive. 615 S.E.2d at 399. After the husband died, his daughter was substituted as the personal representative of the husband's estate. *Id*. at 399-400. The court held a jury trial, and the jury found that the wife "procured the marriage to [the husband] by exerting undue influence upon him." *Id*. at 401. After the trial court entered an order annulling the marriage, the wife appealed. *Id*. The wife argued on appeal that her husband's daughter could not maintain the annulment

13

action following his death. *Id.* The North Carolina Court of Appeals disagreed, reasoning that, because "the annulment action was commenced on [the husband's] behalf prior to his passing, and substantial property rights hinge on the validity of the marriage between [the husband] and [the wife], we conclude that the action for annulment did not abate upon [the husband's] death." *Id.*

In the case *sub judice*, appellant filed the annulment petition over a year after Katherine died. If Katherine had initiated an annulment action on her own behalf prior to her death, appellant, as Katherine's personal representative, may have been permitted to continue such lawsuit, because Katherine, herself, would have made the initial decision to attack her own marriage. *See* ET § 7-401(y) (allowing a personal representative to "prosecute, defend, or submit to arbitration actions, claims, or proceedings" on behalf of the decedent). Katherine did not do so, even though she was fully aware of appellee's fraud in inducing her to marry him.

Because appellant's petition for the annulment of Katherine's marriage to appellee is based on fraud, a voidable ground, we conclude that appellant, as personal representative of Katherine's estate, does not have standing to bring an action challenging Katherine's marriage to appellee on Katherine's behalf. Accordingly, the trial court did not err by dismissing appellant's petition with prejudice.

## II. The Requirement of a Hearing under Maryland Rule 2-311(f)

Appellant argues that the circuit court erred by failing to hold a hearing before dismissing her petition, especially considering that the court had ordered that the instant case "be set in for a hearing." According to appellant, under Maryland Rule 2-311(f), the

14

court "may not render a decision that is dispositive of a claim or defense without a hearing if one was requested." Appellant concludes that the court denied her "due process and her day in court as required by [ ] Rule 2-311(f)."

Appellant is correct that the circuit court erred in dismissing her petition with prejudice without holding a hearing. *See* Md. Rule 2-311(f) (providing that the circuit court "may not render a decision that is dispositive of a claim or defense without a hearing if one was requested as provided in this section"). However, in light of our holding that appellant does not have standing to file a petition to annul Katherine's marriage to appellee, we see no purpose of remanding the case to the circuit court to hold a hearing when the court's dismissal of appellant's petition is mandated by law. Such a remand would be an exercise in futility and a waste of judicial resources. *See Express Auction Servs., Inc. v. Conley*, 127 Md. App. 447, 450 (1999) (noting that, although the circuit court committed error in granting summary judgment without holding a hearing, remanding the case to hold a hearing would nonetheless serve no practical purpose); *Williams v. Prince George's Cty.*, 112 Md. App. 526, 560 (1996) ("[A] remand would not present the trial judge with an opportunity to adjudicate any legal issues not already addressed in this opinion."); *Briscoe v. Mayor of Balt.*, 100 Md. App. 124, 128 (1994) (concluding that the circuit court erred in not conducting a required oral hearing on the motion to dismiss, but determining that no practical purpose would have been served by remanding the matter for a hearing as the parties had agreed that the appeal only involved issues of law). Accordingly, we affirm the judgment of the circuit court, notwithstanding its error in dismissing appellant's petition without first holding a hearing.

**JUDGMENT OF THE CIRCUIT COURT FOR ST. MARY'S COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**