*Victoria Regina Trapasso v. Elliot N. Lewis, Personal Representative of the Estate of Thomas Edwin Kramer*, No. 2843, September Term 2018. Opinion by Beachley, J.

**MARRIAGE—UNLICENSED MARRIAGE—VALIDITY**

In 2003, husband and wife, without obtaining a marriage license, executed a "Marriage Agreement" and participated in a religious marriage ceremony, thereafter holding themselves out as married. They thereafter purchased property as tenants by the entireties. In 2015, wife executed a deed purportedly transferring her interest in the property to a trust. After wife's death, the trustee filed a petition to quiet title to the property, alleging that the property was held as tenants in common because the unlicensed marriage was not valid under Maryland law. Husband alleged that the marriage was valid and that, as the surviving tenant, he was the sole owner of the property.

Following a bench trial, the circuit court determined that the parties were validly married and, accordingly, that husband was the sole owner of the property by virtue of the tenants by the entireties deeds. The trustee noted this appeal in which she claims the circuit court erred because Section 2-401 of the Family Law Article invalidates marriages obtained without a license.

*Held*: Judgment affirmed.

Following *Feehley v. Feehley*, 129 Md. 565 (1916), the Court held that the parties' failure to obtain a marriage license as required by Section 2-401 of the Family Law Article did not nullify the parties' marriage where they executed a "Marriage Agreement" evidencing their intent to be married and participated in a marriage ceremony officiated by their priest. Accordingly, wife's deed purportedly transferring her interest in tenants by the entireties property was void and her interest in the property transferred to husband by operation of law on her death.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2843

September Term, 2018

———————————

VICTORIA REGINA TRAPASSO

v.

ELLIOT N. LEWIS, PERSONAL
REPRESENTATIVE OF THE ESTATE OF
THOMAS EDWIN KRAMER

———————————

*Meredith,
Kehoe,
Beachley,

JJ.

———————————

Opinion by Beachley, J.

———————————

Filed: September 29, 2020

*Meredith, J., now retired, participated in the
hearing and conference of this case while an
active member of the Court. He participated in
the adoption of this opinion after being recalled
pursuant to Maryland Constitution, Article IV,
Section 3A.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In 2003, Waltraud Regina and Thomas Kramer[1] were purportedly married by a religious marriage ceremony, though they never obtained a marriage license. The couple subsequently purchased a condominium unit as tenants by the entireties. In 2015, Regina executed a deed conveying her interest in the property to the Waltraud Regina Living Trust. After Regina's death in 2016, appellant Victoria Trapasso, as Substitute Trustee of the Trust, filed a petition to quiet title to the property, essentially requesting a declaration that the Trust owned fifty percent of the property because Regina and Kramer were never validly married. The Circuit Court for Anne Arundel County determined that Regina and Kramer were validly married and, accordingly, that Kramer was the sole owner of the property by virtue of the tenants by the entireties deeds.[2]

Trapasso timely appealed and presents the following question:

Were [Kramer] and [Regina] legally married, so that Waltraud Regina lacked the legal capacity to convey her interest in the real property at issue?

Applying long-standing Maryland precedent, we conclude that Regina and Kramer were validly married and shall therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 28, 2003, Waltraud Regina and Thomas Kramer signed a "Marriage

---

[1] Kramer died on June 21, 2020. The personal representative of his estate was substituted as appellee on July 31, 2020.

[2] By two separate deeds, Regina and Kramer acquired, as tenants by the entireties, a condominium unit in the Wintergreen Condominium Association as well as "L.C.E. Garage Space 306" and "G.C.E. Storage Unit 2." We shall simply refer to both conveyances as the "property" or the "condominium."

Agreement" and participated in a religious wedding ceremony. Their failure to obtain a marriage license is at the center of this appeal. We reprint the Marriage Agreement the parties executed on September 28, 2003:

> IN THE PRESENCE OF GOD and of the hereinafter named witnesses, I, Thomas E. Kramer, do take Waltraud Regina to be my lawful wedded wife, and I do promise to love, honor and obey, to support her, be always faithful, cherish, hold and care for her in sickness and in health until death we do part.
>
> And,
>
> IN THE PRESENCE OF GOD and of the hereinafter named witnesses, I, Waltraud Regina, do take Thomas E. Kramer to be my lawful wedded husband, and I do promise to love, honor and obey, to support him, be always faithful, cherish, hold and care for him in sickness and in health until death we do part.
>
> I, Thomas E. Kramer, do recognize and hold these aforementioned marriage vows to be binding on me in the same way any civil marriage license and civil or religious church ceremony would be. I do also recognize and concede that Waltraud Regina has the same rights as if we were bound as Husband and Wife by a civil marriage license and civil or religious church ceremony.
>
> And,
>
> I, Waltraud Regina, do recognize and hold these aforementioned marriage vows to be binding on me in the same way any civil marriage license and civil or religious church ceremony would be. I do also recognize and concede that Thomas E. Kramer has the same rights as if we were bound as Husband and Wife by a civil marriage license and civil or religious church ceremony.
>
> BY THE SIGNING OF THIS MARRIAGE AGREEMENT, and the taking and holding of the aforewritten Vows, we the undersigned Bride and Groom, in the presence of Almighty GOD and of the undersigned Witnesses, do declare ourselves to be Husband and Wife.

Four attesting witnesses signed the Marriage Agreement. The Reverend Robert S. Louiselle, Sr., of St. Paul's Anglican Church in Annapolis officiated the marriage

ceremony and signed a "Certification" that Regina and Kramer "were joined together in the Holy State of Matrimony" on September 28, 2003, in Crownsville, Maryland.

The couple subsequently purchased as tenants by the entireties a condominium unit known as 8612 Wintergreen Court, Unit 306, Odenton, Maryland. On March 4, 2015, Regina executed a deed conveying her interest in the property to the Waltraud Regina Living Trust.

Regina established the Trust in 1998, before meeting Kramer. The Trust, a revocable trust, designated Regina as its initial trustee. An amendment to the Trust in 2014 named Trapasso, Regina's daughter from a prior marriage, as the first successor Trustee upon Regina's death or incapacity. Regina also executed a Last Will and Testament in 2014, designating Trapasso as personal representative and bequeathing all of Regina's "probate estate" to the Trust. Kramer is not mentioned in either the Trust instrument or the Will.

Regina died on June 18, 2016, and was buried with her first husband. On August 10, 2016, Kramer executed a "Confirmatory Deed" in which he recited that Regina "purportedly conveyed her interest in derogation of her interest in the property as a tenant by the entirety." The Confirmatory Deed further recited that as a result of Regina's death, Kramer was vested with sole title to the property as the surviving tenant by the entirety.

Trapasso, as Substitute Trustee, filed a Petition to Quiet Title, and for Sale in Lieu of Partition of Real Property, and an Order to Discharge Proceeds, seeking a declaration that the Trust owned fifty percent of the property. Kramer filed an Answer to the Petition,

disputing the validity of the March 4, 2015 deed conveying Regina's interest in the property to the Trust.

A bench trial took place on September 21, 2018. No live testimony was presented; the parties agreed to submit their cases based on proffers and extensive documentary evidence, all of which was admitted without objection. The court received the deposition testimony of Reverend Louiselle, an ordained priest of the Anglican Church. Reverend Louiselle verified that he presided over the September 28, 2003 marriage ceremony in accordance with the precepts of the Church. He noted that he had known the couple for approximately seven years before they approached him about getting married.

In addition to the deeds at issue, the Trust documents, and Regina's Last Will and Testament, the parties submitted evidence bearing on whether Regina considered herself to be married to Kramer. That evidence included documents verifying that Regina was receiving Social Security benefits based on her first marriage, and that she maintained accounts with Verizon and AT&T, as well as bank accounts, solely in her name. Regina also represented to the Internal Revenue Service that she was "single." On the other hand, there was evidence presented that Regina co-signed an auto loan with Kramer and held a joint checking account with him.

The circuit court determined that Regina and Kramer were validly married under Maryland law "by virtue of their religious wedding held on September 28, 2003." In doing so, the court found that the Marriage Agreement and related documents "included almost every component of what one might utilize in their preparation of a marriage." Accordingly, the court declared invalid Regina's deed conveying her interest in the

4

property to the Trust, and concluded that Kramer became the sole owner of the property upon Regina's death.[3] The court entered its Order on October 25, 2018, from which Trapasso, in her capacity as Substitute Trustee, timely appeals.

## DISCUSSION

We are asked to answer a straightforward question: Were Regina and Kramer validly married under Maryland law despite having never obtained a marriage license as required by Section 2-401 of the Family Law Article? Because Maryland precedent requires us to answer "Yes" to that question, we hold that Regina's deed purporting to convey her interest in the property to the Trust was a nullity.

We begin with some basic principles of real property law. A tenancy by the entireties may only be held by a married couple. *Young v. Young*, 37 Md. App. 211, 216 (1977). If the marriage is dissolved through divorce or annulment, or is otherwise invalid, the parties would instead hold the property as tenants in common or joint tenants. *E.g., Columbian Carbon Co. v. Kight*, 207 Md. 203, 210 (1955); *Young*, 37 Md. App. at 216. In a tenancy by the entireties, one spouse generally may not act alone to convey an interest in the property; the other spouse must assent to the conveyance. *Bruce v. Dyer*, 309 Md. 421, 428 (1987); *see also* Maryland Code (1974, 2015 Repl. Vol.), § 4-108(b) of the Real Property Article ("RP"). This is in contrast to tenancies in common and joint tenancies, which allow a single tenant to convey his or her interest in the property without permission

---

[3] The court also declared that Regina's March 4, 2015 deed to the Trust and Kramer's Confirmatory Deed dated August 10, 2016, "shall be stricken as they are of no force or effect."

5

from the other tenant. RP § 4-108(a); *see Helinski v. Harford Mem. Hosp., Inc.*, 376 Md. 606, 616 (2003) (joint tenancy may be severed through conveyance by one of the joint tenants). Thus, if Regina and Kramer were married, Regina's March 4, 2015 deed conveying her share of the property to the Trust without Kramer's assent was invalid.

Trapasso argues that Regina and Kramer were not validly married because Family Law Article §§ 2-401(a) and 2-406(e) require parties to obtain a marriage license before marrying. Maryland Code (1984, 2019 Repl. Vol.), §§ 2-401(a), -406(e) of the Family Law Article ("FL"). Trapasso avers that, because a couple cannot create a common law marriage in Maryland, a marriage license is a prerequisite for a valid marriage.

Kramer responds that applicable caselaw clearly holds that a ceremonial marriage without a license is sufficient to constitute a valid marriage in Maryland. He claims that FL § 2-401 creates criminal liability for marrying without a license, but does not nullify the marriage itself because the statute is in derogation of the common law and does not expressly state that such a marriage is void.

Section 2-401 of the Family Law Article states, in its entirety:

(a) An individual may not marry in this State without a license issued by the clerk for the county in which the marriage is performed.

(b) Any individual who violates this section is guilty of a misdemeanor and on conviction is subject to a fine of $100.

Section 2-406 of the Family Law Article addresses the requirements to perform a marriage ceremony. It states, in pertinent part:

(e)(1) An individual may not perform a marriage ceremony without a license that is effective under this subtitle.

6

(2) An individual who violates the provisions of this subsection is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $500.

The Court of Appeals articulated the principles of statutory interpretation in *Sieglin v. Schmidt*, 447 Md. 647, 659-60 (2016) (quoting *Anderson v. Council of Unit Owners of Gables on Tuckerman Condo.*, 404 Md. 560, 571–72 (2008)):

> In statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. Further, an interpretation should be given to the statutory provisions that does not lead to absurd consequences. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. If, however, the language is subject to more than one interpretation, or when the terms are ambiguous when it is part of a larger statutory scheme, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute.

"Even in instances 'when the language is unambiguous, it is useful to review legislative history of the statute to confirm that interpretation and to eliminate another version of legislative intent alleged to be latent in the language.'" *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (quoting *State v. Roshchin*, 446 Md. 128, 140 (2016)). Additionally, "[s]tatutes in derogation of the common law are strictly construed, and it is not to be presumed that the [L]egislature by creating [a statute] intended to make any alteration in the common law other than what has been specified and plainly pronounced." *Cosby v. Dep't of Human Res.*, 425 Md. 629, 645 (2012) (first and second alterations in original) (quoting *Breslin v. Powell*, 421 Md. 266, 287 (2011)). Therefore, statutes relating to the validity of a marriage

7

are merely directory unless the statute clearly indicates a legislative intention to nullify such marriages. *Picarella v. Picarella*, 20 Md. App. 499, 512–13 (1974) (quoting *Feehley v. Feehley*, 129 Md. 565, 568–71 (1916)).

"[T]here is 'an ambiguity within [a] statute' when there exist 'two or more reasonable alternative interpretations of the statute.'" *Brown v. Brown*, 195 Md. App. 72, 113 (2010) (second alteration in original) (quoting *Chow v. State*, 393 Md. 431, 444 (2006)). The plain language of FL § 2-401 could reasonably be read as either declaring unlicensed marriages invalid and therefore void *ab initio*, or as merely encouraging licensure through the creation of a misdemeanor punishable by a fine, without nullifying the underlying marriage. Because the statute is ambiguous, we must look outside its plain language to determine whether an unlicensed marriage is valid. Fortunately, this particular question of statutory interpretation has been resolved in prior cases, most notably over one hundred years ago in *Feehley*.

For background, we note the difference between a "common-law marriage" and a ceremonial marriage. It is well-settled that a common-law marriage may not be created in Maryland. *John Crane, Inc. v. Puller*, 169 Md. App. 1, 55 (2006) (citing *Denison v. Denison*, 35 Md. 361 (1872)). However, the phrase "common-law marriage" is often misused. The phrase "common-law marriage" refers specifically to one formed when a couple agree to be married, hold themselves out as married, and cohabit as a married couple without participating in a formal ceremony. *E.g., Blaw-Knox Constr. Equip. Co. v. Morris*, 88 Md. App. 655, 670–72 (1991) (discussing common-law marriages in Pennsylvania).

8

These actions by themselves have never been recognized as forming a marriage in Maryland. *John Crane, Inc.*, 169 Md. App. at 55 (citing *Denison*, 35 Md. 361).

The common law of England recognized another type of marriage: a ceremonial marriage, that is, one solemnized by a religious ceremony. *Denison*, 35 Md. at 373. Ceremonial marriages were the only type of marriage ever recognized under Maryland's common law, either as a colony or as a state.[4] *Id.* at 379. With this background in mind, we turn to the caselaw that controls the resolution of this case.

In *Feehley*, the parties were married in 1891 and divorced in 1896. 129 Md. at 566. In 1915, they reunited and, without first obtaining a marriage license, participated in a religious ceremony where the parties "understood that [the priest] was officiating there in order that they might live together in lawful wedlock." *Id.* at 566–68. Approximately a year later, the wife filed a complaint for divorce, seeking alimony and division of property. *Id.* at 566. The husband's defense was "based upon the theory that the parties were not lawfully remarried." *Id.* The relevant statute provided "that no persons within the State 'shall be joined in marriage until a license shall have been obtained from the clerk of the [c]ircuit [c]ourt for the county in which the marriage is to be performed.'" *Id.* at 568. The husband therefore contended that the failure to secure a marriage license rendered the marriage void. *Id.*

In determining the validity of the marriage, the Court considered the purpose of the

---

[4] Although a ceremony is still required for a marriage under Maryland's current statutory scheme, it need not be religious in nature. FL § 2-406(a)(2).

9

licensing statute as it related to the common law. Under Maryland's common law, "a religious ceremony, in celebration of the civil contract, was sufficient to make the marriage lawful." *Id.* at 569. The Court noted that "statutes providing for marriage licenses are not held to have the effect of nullifying, for noncompliance with their terms, a marriage valid at common law, unless such an intention is plainly disclosed." *Id.* The Court declined to infer any legislative intent to nullify an unlicensed marriage, stating: "The regulative purposes of the license statute are useful and important, but they are sought to be enforced by pecuniary penalties pronounced against those officiating at unlicensed marriages, and not by the radical process of rendering void and immoral a matrimonial union otherwise validly contracted and solemnized." *Id.* at 570.

More than half a century later, this Court relied upon *Feehley* to uphold a marriage where the license was improperly procured. *Picarella*, 20 Md. App. at 514. In that case, the husband told the clerk when he obtained the marriage license that he was over 18 years old, when in fact he was only 16 years old. *Id.* at 501. Both parties subsequently sought an annulment. *Id.* at 500. After determining that the husband's misrepresentation of his age did not amount to fraud sufficient to authorize an annulment of the marriage, this Court considered whether the marriage could be annulled as a result of the violation of a statute that required that the minor's parent consent to the marriage. *Id.* at 507. The Court discussed *Feehley* and concluded: "The result is that, while the licensing authorities, the parties, and the celebrant may be criminally liable and punished for marrying without a license, the marriage itself is as valid as if one had been procured." *Id.* at 514. Applying that conclusion to the facts, the *Picarella* Court held that "[a] marriage without a license

10

being valid, it follows, we believe, that a marriage under a license improperly procured is valid." *Id.* The Court therefore held that the marriage was neither void nor voidable.[5] *Id.* at 517; *see also Browning v. Browning*, 224 Md. 399, 403 (1961) ("It is well established that the failure to procure a marriage license does not have the effect of rendering the marriage void.").

The language of the marriage licensing statute has not substantively changed since the *Feehley* decision in 1916. At that time the statute provided that "no persons within the state 'shall be joined in marriage until a license shall have been obtained from the clerk of the [c]ircuit [c]ourt for the county in which the marriage is to be performed.'" *Feehley*, 129 Md. at 568. The statute provided in 2003, as it does today, that "An individual may not marry in this State without a license issued by the clerk for the county in which the marriage is performed." FL § 2-401(a). The current statutory language no more "plainly disclose[s]" an intention that unlicensed marriages be nullified than the statutory language in 1916. *Feehley*, 129 Md. at 569. As in *Feehley*, FL §§ 2-401 and 2-406(e) merely create misdemeanors, "enforced by pecuniary penalties pronounced against those officiating at unlicensed marriages [and the parties to such marriage], and not by the radical process of

---

[5] A void marriage is one where the parties could not have established a valid marriage due to some impediment. *Morris v. Goodwin*, 230 Md. App. 395, 404 (2016). "For example, bigamous and incestuous marriages are void marriages, because they are invalid regardless of the parties' consent." *Id.* In a voidable marriage, however, such as one procured by duress or undue influence, "the defect in the marriage goes to a party's consent." *Id.* A voidable marriage is valid until a successful challenge by one of the parties to the marriage. *Id.* at 405–06.

11

rendering void and immoral a matrimonial union otherwise validly contracted and solemnized." *Id.* at 570.

Here, there is no dispute that Regina and Kramer executed the written "Marriage Agreement" on September 28, 2003, and that same day were married in a ceremony officiated by an ordained priest of the Anglican Church. Because Maryland's common law recognized the validity of such marriages, and because there is no statute that "plainly discloses" a legislative intent to nullify unlicensed marriages, *Feehley*, 129 Md. at 569, we hold that Regina and Kramer were validly married. The property at issue here was acquired during their marriage and therefore could be owned by them as tenants by the entireties as provided in the deeds. Under established real property law, Regina did not have the legal authority to convey her interest in the property without Kramer's assent, thus making the March 4, 2015 deed invalid. When Regina died, Kramer became the sole owner of the property by operation of law. Accordingly, we affirm the circuit court's judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

12